James E. THOMAS, Rosie M. Thomas
and the Northwest Indiana Open
Housing Center, Inc., Plaintiffs,

v.

FIRST FEDERAL SAVINGS BANK OF
INDIANA and Joseph Kurpis, a/k/a
Rudy Kurpis, Defendants.

Civ. No. H84–716.

United States District Court,
N.D. Indiana,
Hammond Division.

Feb. 6, 1987.

Rosalind Parr, Albert Marshall, Jr., Gary, Ind., for plaintiffs.

Fred Cuppy, Kathryn D. Schmidt, Merrillville, Ind., Stephen Smith, Chicago, Ill., for defendants.

## ORDER and MEMORANDUM OPINION

MOODY, District Judge.

On Tuesday, January 20, 1987, a bench trial commenced in this action brought by plaintiffs James and Rosie Thomas and the Northwest Indiana Open Housing Center, Inc. (the "Center") against defendant First Federal Savings Bank of Indiana ("First Federal") and Joseph Kurpis a/k/a Rudy Kurpis, a vice president and loan officer for First Federal. Both plaintiffs and defendants were represented by counsel throughout the trial in this case. On Wednesday, January 21, 1987, plaintiffs rested their case and defendants, immediately thereafter, moved for an involuntary dismissal pursuant to Fed.R.Civ.P. 41(b); the court took defendants' dismissal motion under advisement. On Thursday, January 23, 1987, after considering all the evidence and having determined the credibility of witnesses based on their respective demeanor and interests, the Court GRANTED defendants' 41(b) dismissal motion. The court now renders the following Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a).

### I.

#### *Findings of Fact*

Plaintiffs alleged that defendants discriminated against the Thomases based on their race and "red-lined" the neighborhood where the Thomases lived in violation of the Fair Housing Act, 42 U.S.C. §§ 3604 and 3605, the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982, and the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691, *et seq.*

Plaintiffs James and Rosie Thomas are black citizens of the United States residing in Gary, Indiana. The plaintiff Center is a not-for-profit corporation organized under the laws of Indiana and supported by private contributions, foundation grants and contracts with certain cities. The purpose

of the organization is to further the goals of the Fair Housing Act and to promote equal opportunity in housing in northwest Indiana. The Center's activities include referral services, housing and financial counseling to minority homeseekers, investigation of complaints of housing discrimination and legal representation in actions involving discrimination.

Defendant First Federal is a mutual thrift institution chartered under section 5 of the Homeowners Loan Act of 1933, 12 U.S.C. §§ 1461 *et seq.* As such, First Federal is subject to the constitution and laws of the United States and to all rules, regulations and orders issued by the Federal Home Loan Bank Board ("Bank Board"). Defendant Rudy Kurpis is, and was at the time of the incidents herein, a vice president and loan officer for First Federal.

On March 29, 1984, James Thomas went to the main office of First Federal located at 545 Broadway, Gary, Indiana to apply for a loan with the intention of using the money to pay off a $6,000.00 balance owing on a conditional sales contract for the purchase of real estate property located at 742 Johnson Street, Gary, Indiana and to make some necessary repairs on that property. The 742 property is located next door to the Thomases' residence which is located at 756 Johnson Street, Gary, Indiana. Mr. Thomas met with Mr. Kurpis and, after one discussion, Thomas decided to apply for a second mortgage on his residence at 756 Johnson in the amount of $7,100.00.

A loan application was filled out by Kurpis with information provided by Thomas. Both James and Rosie Thomas were applicants for the loan and were to be liable under the mortgage note. Because the Thomases planned to use their home at 756 Johnson as collateral for the loan, Kurpis explained that First Federal required an appraisal of the property.

After the Thomases paid an application fee of $200.00, Kurpis informed them that a real estate appraiser would be sent to their home on a particular date. There was some confusion about the exact location and time of the scheduled appraisal and it was not until the third scheduling that the appraiser showed up.

At that third appointment, Mr. Thomas met Mr. Beckham who was employed by First Federal for 25 years as its in-house and chief appraiser. Beckham was deceased at the time of trial. Thomas testified that he showed Beckham the entire house and pointed out to him the many renovations and improvements that the Thomases had made to their home. Among the many repairs and renovations listed by Thomas were: an alarm system ($1,400.00); kitchen improvements ($3,000.00, materials alone); new thermal picture window, 18' x 15' ($1,000.00); storm windows throughout the house ($1,500.00); a new roof ($1,800.00); and a newly constructed addition to the den ($15,000.00).[1] After completing the tour of the house, Mr. Thomas testified that Beckham told him that if the house were located anywhere else it would be worth $100,000.00 and that the Thomases should have no problem getting the $7,100.00 loan.

Approximately two to three weeks after Beckham had visited their residence, the Thomases had not heard from First Federal on the status of their loan application. Rosie Thomas called Kurpis and was informed that their loan application had been denied because their loan-to-value ratio had exceeded First Federal's guidelines. Kurpis further explained that there was no reason for the loan application to go before First Federal's loan committee for additional review because it would be denied on the basis of the loan-to-value ratio.

The Thomases had a first mortgage on their home at 756 Johnson of approximately $17,000.00 and they were requesting a second mortgage of $7,100.00. The total mortgage debt, had the loan been approved, would have been $24,100.00. Beckham appraised the 756 Johnson property at

---

**1.** Rosie Thomas testified that the cost of the addition to the den was between four and five thousand dollars.

$22,000.00. When comparing the total mortgage debt, $24,100.00, to the appraised value of the property, $22,000.00, the loan-to-value ratio ($24,100.00 divided by $22,-000.00) was over 105%. First Federal's guidelines for loan approval required that the loan-to-value ratio be 80% or less.

The Thomases received an "adverse action" letter from First Federal, dated June 26, 1984, signed by Rudolph Kurpis, which stated that the reason their application had been denied was that the "value of Property ratio to Mtg., 1st & 2nd. exceeded 105% Policy is 80%." Prior to receiving the written notice, James Thomas also called Kurpis and requested an explanation for the loan denial. After Kurpis explained the consequences of the loan-to-value ratio, Thomas then asked for a refund of the $200.00 application fee. Thomas went to First Federal and picked up a check for $133.00. A note was attached to the check stating that the refund represented the application fee minus expenses for a credit check and the appraisal of the house. The note further indicated that had the application gone to the loan committee the entire application fee would have been forfeited.

Both James and Rosie Thomas testified that they had no further communication with defendants after they received their refund check. The Thomases never contacted First Federal or Rudy Kurpis in an attempt to get a more detailed explanation of the loan-to-value ratio. They both admitted at trial that they did not fully understand the significance of the ratio.

At trial, plaintiffs offered the testimony of another real estate appraiser, George Wilkes, who appraised the value of their home at 756 Johnson. Wilkes testified that he had been in the real estate appraisal business, in northwest Indiana, for over 13 years. However, he admitted that he was not a registered member of any recognized society of appraisers. Wilkes appraised the Thomases' home on January 10, 1987, at $40,000.00; he testified that this evaluation was based on 1984 criteria. Wilkes explained that he appraised the property by looking back at the conditions of the house, the housing market, and comparable houses in 1984.

In an effort to explain the substantial difference between his appraisal and that of Mr. Beckham, Wilkes offered his personal critique of Beckham's appraisal. In going over Beckham's appraisal, Wilkes was limited to the four corners of the appraisal document and was not permitted to speculate as to Beckham's subjective evaluations.

Wilkes testified that there are essentially three "accepted" methods used by appraisers: (1) cost approach; (2) market sales approach; and (3) income approach. Wilkes explained that the income approach was seldom used for single family dwellings. Wilkes briefly described the cost approach as computing the original purchase price minus any depreciation plus the appreciated land value. The market sales approach, perhaps the most commonly employed method, involves a comparison between the subject property and "comparable" pieces of property, usually three in number. Wilkes stated that the primary considerations in selecting comparable properties are the date of sale (usually within six months of the subject property), similarity of structure and size, and the physical proximity to the subject property (usually within the same neighborhood).

After deciding upon the comparables, an appraiser will make adjustments in the price of the subject property in comparison to the comparable, depending on whether the subject property is deemed superior or inferior to the comparable. For example, if a comparable has central air conditioning and the subject property does not, the comparable is deemed superior to the subject property and a negative adjustment should be made in the selling price of the comparable in order to arrive at an estimated value of the subject property.

Throughout his testimony, Wilkes repeatedly stated that the process of appraising was more appropriately viewed as an art rather than an exact science. Wilkes testified that by labelling certain appraising methods as "accepted," the various so-

cieties of appraisers were attempting to establish a degree of consistency and objectivity in the art of appraising. Nevertheless, Wilkes admitted that a substantial portion of an appraisal is based on the very subjective evaluations made by the individual appraiser.

Wilkes was critical of Beckham's appraisal and took exception with many of Beckham's adjustments in his comparable sales analysis. In particular, Wilkes cited Beckham's use of dashes ("—") in various portions of his appraisal form as inappropriate. Although Wilkes was not permitted to speculate as to what Beckham meant by the dashes, he did state that a better practice would be to indicate on the form with particularity the reason for an adjustment.

On cross examination it was revealed that Wilkes did not use the same appraisal form as Beckham when making his appraisals. Beckham routinely used the "Fannie Mae" or "Freddie Mac" appraisal forms issued by the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation. Wilkes admitted that he was not very familiar with the detailed guidelines issued by these two federal agencies for filling out their forms. In fact, he testified that it was his understanding that two sections in the forms, entitled "Neighborhood" and "Property Rating," were essentially identical in the type of information they requested.

When asked to look at other appraisals done by Beckham, Wilkes found that Beckman routinely used dashes on his appraisal forms. These other appraisals were for homes throughout northwest Indiana, including the cities of Lake of the Four Seasons, Chesterton, Schererville, Dyer, Lake Station, Portage, Hobart, Lowell, Griffith, East Chicago, Highland, Merrillville, Crown Point, Hammond and Gary. In fact, after reviewing these other appraisals, Wilkes stated that it appeared Beckham conducted all his appraisals in the same manner, regardless of the city or even the neighborhood.

Wilkes provided no testimony whatsoever on the intent of Beckham, Kurpis, or First Federal when making appraisals and processing loan applications. Wilkes' testimony, at best, established that he did not approve of many of Beckham's subjective determinations, however, Wilkes admitted that Beckman was consistent in making his evaluations; that is, there was no evidence that Beckham appraised an individual's home or a home in a particular neighborhood any differently than others similarly situated.

Additionally, Wilkes testified that it was quite possible that the Thomases' home was "overimproved" for the neighborhood it was in. Wilkes explained that when homeowners make improvements or additions to their homes they cannot always be assured that the sale price will reflect the exact dollar investment of the improvement or addition. For example, an $8,000.00 addition to a house valued at $30,000.00 does not necessarily mean the house will sell for $38,000.00. In fact, according to Wilkes, it is almost certain that the house will not sell for the full $38,000.00. The difference between the $38,000.00 and the actual selling price is the amount the house is said to be "overimproved."

Finally, plaintiffs submitted as evidence copies of mortgage loan disclosure statements prepared by First Federal for the years 1983 and 1984 pursuant to the Home Mortgage Disclosure Act, 12 U.S.C. §§ 2801 *et seq.* and 12 C.F.R. §§ 203.1 *et seq.* These reports are required for the purposes of determining whether an institution like First Federal is serving the needs of a particular community and to assist public officials in distributing public money into areas that are in need. 12 C.F.R. § 203.1(b) (1986).

It was unclear at trial and remains unclear to the court today exactly what relevance these mortgage foreclosure statements have in this case. According to plaintiffs, these statements reveal the total number and dollar amounts of loans made by First Federal in the years 1983 and 1984 for the communities of Gary, Hammond, East Chicago and the remainder of the County of Lake. The plaintiffs offered no

further explanation of these statements nor did they attempt to demonstrate how these statistics helped prove their case.

## II.

### *Conclusions of Law*

■ In ruling on a 41(b) motion, the court must take an unbiased view of all the evidence, direct and circumstantial, and accord it such weight as the court believes it is entitled to receive. *Sanders v. General Services Admin.,* 707 F.2d 969, 971 (7th Cir.1983); *Patterson v. General Motors Corp.,* 631 F.2d 476, 487 (7th Cir.1980); *cert. denied,* 451 U.S. 914, 101 S.Ct. 1988, 68 L.Ed.2d 304 (1981). The court is not to make any special inferences in the plaintiffs' favor nor concern itself with whether the plaintiffs have made out a *prima facie* case. Instead, the court is to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies. *Sanders,* 707 F.2d at 971; 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2371 at 224–25 (1971 & Supp. 1986).

Plaintiffs alleged violations of the Federal Housing Act, 42 U.S.C. § 3604 and 3605; the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 *et seq.;* and the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982. In making its conclusions of law, the court will address the statutory violations in turn.

### A.

### *Fair Housing Act*

In pertinent part, sections 3604 and 3605 of the Fair Housing Act provide:

§ 3604. Discrimination in sale or rental of housing.

As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, or national origin.

\* \* \* \* \* \*

§ 3605. Discrimination in financing of housing

After December 31, 1968, it shall be unlawful for any bank, building and loan association, insurance company or other corporation, association, firm or enterprise whose business consists in whole or in part in the making of commercial real estate loans, to deny a loan or other financial assistance to a person applying therefor for the purpose of purchasing, constructing, improving, repairing, or maintaining a dwelling, or to discriminate against him in the fixing of the amount, or to discriminate against him in the fixing of the amount, interest rate, duration, or other terms or conditions of such loan or other financial assistance, because of the race, color, religion, sex, or national origin of such person or any person associated with him in connection with such loan or other financial assistance or the purposes of such loan or other financial assistance, or of the present or prospective owners, lessees, tenants, or occupants of the dwelling or dwellings in relation to which such loan or other financial assistance is to be made or given: Provided, That nothing contained in this section shall impair the scope or effectiveness of the exception contained in section 3603(b) of this title.

42 U.S.C. §§ 3604 and 3605 (1977 & Supp. 1986).

Initially, the court finds that a fair and liberal reading of plaintiffs' complaint in this action reveals two separate theories of recovery under the Fair Housing Act. First, plaintiffs allege that defendants discriminated individually against the Thomases' by denying their loan application on the

basis of their race. Second, plaintiffs' complaint alleges that defendants denied the Thomases' loan application because of First Federal's practice of "red-lining" the Thomases' neighborhood. Red-lining is defined as "mortgage credit discrimination based on the characteristics of the neighborhood surrounding the would-be borrower's dwelling." *Town of Springfield, Vt. v. McCarren,* 549 F.Supp. 1134, 1142 (D.Vt.1982); *see also Conference of Federal Savings and Loan Assoc's v. Stein,* 604 F.2d 1256, 1259 (9th Cir.1979); *Laufman v. Oakley Bldg. & Loan Co.,* 408 F.Supp. 489 (S.D. Oh.1976).

■ Even after affording plaintiffs' complaint this liberal construction, the court is doubtful that plaintiffs presented allegations sufficient to state a claim under section 3604. Plaintiffs allege that First Federal racially discriminated against the Thomases by refusing to give them a second mortgage on their home at 756 Johnson. The Thomases were not seeking to purchase or rent a home or an apartment; instead, they were attempting to obtain additional financing on their already-owned home by taking out a second mortgage. Section 3604 is entitled "Discrimination in the *sale* or *rental* of housing" while section 3605 is entitled "Discrimination in the *financing* of housing" (emphasis added). Thus, at first glance, it appears that the plaintiffs' complaint in this action must be brought exclusively under section 3605 which deals specifically with the availability of financing. Otherwise, if section 3604 was read to reach every discriminatory act that might conceivably involve housing, section 3605's "specific prohibition of discrimination in the provision of financing would [be] superfulous." *Mackey v. Nationwide Ins. Companies,* 724 F.2d 419, 423 (4th Cir.1984).

Moreover, the Seventh Circuit in *Southbend Neighborhood Improvement Assoc. v. County of St. Clair,* 743 F.2d 1207 (1984), when construing the scope of section 3604, stated that "[s]ection 3604(a) applies to the *availability of housing.* That section thus is violated by discriminatory actions, or certain actions with discriminatory effects, that affect the *availability of housing." Id.* at 1210 (emphasis added). The plaintiffs in *Southbend* alleged that the county's discriminatory refusal to properly manage the properties it owned damaged their interests in neighboring properties. The court, in finding that section 3604 was not meant to cover such actions, held that section 3604 is "designed to ensure that no one is denied the right to live where they choose for discriminatory reasons, but it does not protect the intangible interests in the already-owned property raised by the plaintiffs [sic] allegations." *Id.*

Like the plaintiffs in *Southbend,* the Thomases are seeking to protect their interests in their already-owned property. The Thomases alleged that First Federal racially discriminated against them by denying their application for a second mortgage. Because their allegations concern the availability of additional financing, and not the availability of housing, the court finds that section 3604 is not implicated by plaintiffs' complaint.

The court finds this same analysis applies to plaintiffs' red-lining theory of recovery. Although red-lining practices in cases affecting the availability of housing are actionable under section 3604, *see* 73 A.L.R.Fed. § 899 (1985 & Supp.1986) (and cases cited therein), red-lining practices which affect the availability of financing are more properly brought under section 3605. Therefore, having determined that the allegations in this case do not implicate section 3604, the court now turns to section 3605 which deals specifically with the availability of financing for such purposes as improving and repairing already-acquired property.

The court has been unable to find cases of discrimination involving the availability of financing which set forth the elements of a cause of action under section 3605. However, cases involving other forms of discrimination under the Fair Housing Act are instructive and analogous. For example, in *Davis v. Mansards,* 597 F.Supp. 334

(N.D.Ind.1984), a case involving discrimination in the rental of apartments, this court articulated the following elements for a section 3604 action:

(1) that the plaintiff is a member of a racial minority;

(2) that he or she applied for and was qualified to rent or purchase a certain property or housing;

(3) that he or she was rejected; and

(4) that the housing or rental opportunity remained available thereafter.

*Id.* at 345.

In another case, where plaintiffs alleged a discriminatory intent on the part of defendant in the denial of a house sale, the Seventh Circuit set forth the prima facie case as follows:

> To make out their prima facie case under the Fair Housing Act, [plaintiffs] had only to show that they were black, that they applied for and were qualified to buy the Broderick house, that they were rejected, and that the Broderick house remained on the market.

*Phillips v. Hunter Trails Community Ass'n.,* 685 F.2d 184, 190 (7th Cir.1982) (citing *Robinson v. 12 Lofts Realty,* 610 F.2d 1032, 1038 (2d Cir.1979)).

More recently, the Seventh Circuit set forth the elements of a prima facie case under section 3604 as follows:

(1) [plaintiff] belongs to a minority; (2) the defendant was aware of it; (3) the plaintiff was ready and able to accept defendant's offer to rent; and (4) the defendant refused to deal with [plaintiff].

*Hamilton v. Svatik,* 779 F.2d 383, 387 (7th Cir.1985) (citing *Kaplan v. 442 Wellington Coop Building Corp.,* 567 F.Supp. 53, 65 (N.D.Ill.1983)).

 Drawing from the lesson of these earlier cases and tailoring it to the facts here, the court holds that in order for plaintiffs to establish a prima facie case of racial discrimination under section 3605,

they must prove (1) that they were members of a protected class; (2) that they applied and were qualified for a loan from defendants; (3) that the loan was rejected despite their qualifications; and (4) that defendants continued to approve loans for applicants with qualifications similar to plaintiffs.[2]

Applying this standard to the facts as presented by plaintiffs at trial, the court finds that plaintiffs failed to establish a case under section 3605. Plaintiffs satisfied elements (1) and (3) in that they demonstrated that the Thomases, as black citizens, were members of a protected class and that they were denied a loan. However, plaintiffs failed to present any credible evidence on whether the Thomases were qualified for the loan or that First Federal made loans to other applicants who had similar qualifications.

One of First Federal's requirements for loan applicants is that their loan-to-value ratio, based on the appraised value of the collateral for the loan, be 80% or less. The Thomases did not meet First Federal's standard as their ratio was computed to be in excess of 105%. Plaintiffs do not dispute or challenge the legitimacy of First Federal's guideline of 80%; instead, they argue that First Federal undervalued the Thomases' home in violation of the Fair Housing Act. Plaintiffs maintain that First Federal undervalued the Thomas home because of their race or, alternatively, because First Federal red-lined their neighborhood.

 In theory, the court agrees that a defendant cannot escape liability under the Fair Housing Act by artificially lowering the appraised value of a home for a prohibited reason like race. Plaintiffs need not prove actual intent to discriminate on the part of defendants in order to make out a violation of the Fair Housing Act. *Svatik,* 779 F.2d at 387. However, plaintiffs must show that "race was a motivating consider-

---

**2.** The court previously set forth these elements in this case in an order dated July 30, 1986 wherein the court denied defendants' motion for summary judgment. *Thomas, et al. v. First* *Federal Savings Bank of Indiana, et al.,* No. H 84–716, slip op. at 7 (N.D.Ind., Ham.Div. July 30, 1986). Both parties stipulated to these elements in their respective trial briefs.

ation in the [defendants'] decision" not to make the loan. *Kaplan,* 567 F.Supp. at 57.

The court in *Kaplan* was faced with a similar fact situation in the setting of a section 3604 claim. The court granted summary judgment to the defendant sellers in *Kaplan* because the plaintiff purchasers failed to demonstrate that race played any role in the defendants' decision not to sell to the plaintiffs. In discussing the necessary showing plaintiffs needed to make, the court stated:

> In this context the decision to refuse must rest in some part, be it ever so small, upon considerations of race. But there are conceivably many situations in which the seller and the buyer are of different ethnic identities, with which differences both parties are aware, and in which situation a non-discriminatory decision is made not to go through with the sale. Yet while racial differences could have been among those considerations which led to the decision not to deal, the facts about it could have been insufficient to place a burden on a defendant to prove the negative of what otherwise was a mere supposition. In those cases one must remember that "to play some part in a refusal" means just that: *to actually contribute in some degree to the sellers arriving at their decision.* This the plaintiff must show, and though in some cases it is an elusive thing to show, it must be shown to some degree before the defendant's motives may be said as a matter of law to have been illegal.

*Id.* at 57 (emphasis added).

■ Here, after plaintiffs presented all their evidence, they still had not shown that defendants' knowledge of the Thomases' race contributed in any degree to either defendants' decision not to make the loan or in appraising the Thomas home. Plain-

tiffs did present the testimony of George Wilkes, a second appraiser, who conducted an independent appraisal of the Thomas home and estimated its 1984 value at $40,-000.00. However, by Wilkes' own admission, his appraisal was merely another subjective evaluation of the Thomas home through the inexact appraisal process. Moreover, Wilkes established that Beckham, First Federal's appraiser, was consistent in his appraisal methods, that is, Beckham used the same techniques regardless of the race or neighborhood of the homeowners.

■ The court does not read section 3605 to require institutions like First Federal to employ specific appraisal techniques when evaluating homes for purposes of making loans. Rather, section 3605 is fairly read to prohibit First Federal and other institutions from utilizing criteria such as race, color, religion, sex or national origin in appraising a potential loan applicant's home. Plaintiffs produced no such evidence at trial.

■ In support of their red-lining theory, plaintiffs rely heavily upon the alleged statement by Beckham to James Thomas that if the Thomas home were anywhere else it would be worth $100,000.00. The court is somewhat dubious about contributing this statement to Beckham, particularly in light of the fact that the only witness to verify it was Thomas himself. As a party plaintiff in this action, James Thomas has a strong interest in the outcome. Fed. R.Evid. 601.[3] Additionally, both James and Rosie Thomas had difficulty recalling their earlier deposition testimony and made several contradictory statements during the trial.[4] Apart from the veracity of the statement, Wilkes testified that it was quite possible that the Thomas home was "overimproved" for the neighborhood.

---

3. A witness' "[i]nterest in the outcome of litigation ... [is], of course, highly relevant to credibility and require[s] no special treatment to render [it] admissible along with other matters bearing upon the perception, memory, and narration of witnesses." Advisory Committee Notes following Fed.R.Evid. 601.

4. The Thomases also had considerable difficulty recalling the exact sequence and proper chronology of events when relating their verison of the facts to the court.

Thus, even assuming that Beckham made such a statement, the court finds that the most logical inference to draw is that Beckham was referring to the overimproved condition of the Thomas home when compared with other houses in the area.

Finally, plaintiffs attempted to present statistical evidence, presumably in support of their red-lining theory. This evidence consisted entirely of the mortgage loan disclosure statements prepared by First Federal for the years 1983 and 1984 pursuant to the Home Mortgage Disclosure Act, 12 U.S.C. §§ 2801 *et seq.* and 12 C.F.R. §§ 203.1 *et seq.* These reports show the number and the amounts of the loans issued by First Federal in 1983 and 1984. The reports break the information down by the types of loans (*e.g.*, FHA, FmHA and VA; conventional; home improvement; multi-family dwellings; and non-occupant loans) and the community (e.g., Gary, East Chicago, Hammond, and the remainder of Lake County). Reading these reports allows the court to compare both the number and the dollar amounts of loans made by First Federal in Gary, based on the type of loans, with loans made in East Chicago, Hammond and the remainder of Lake County.

■ It appears from this presentation that plaintiffs attempted to prove their claim under a "disparate impact" analysis. That such an avenue of recovery is available in the context of the Fair Housing Act was made clear by the Seventh Circuit in *Arlington Heights v. Metropolitan Housing Corp.*, 558 F.2d 1283 (1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978); *see also Phillips v. Hunter Trails Community Ass'n.*, 685 F.2d 184, 189–90 (7th Cir.1982). Thus, plaintiffs do not have to prove actual discriminatory intent in order to prevail, however, statistical disproportion alone is not enough. *Phillips*, 685 F.2d at 189.

In discussing the salient considerations for a disparate impact analysis, the *Phillips* court stated that there were four factors of critical importance:

(1) strength of the plaintiff's statistical showing; (2) the legitimacy of the defendant's interest in taking the action complained of; (3) some indication—which might be suggestive rather than conclusive—of discriminatory intent; and (4) the extent to which relief could be obtained by limiting interference by, rather than requiring positive remedial measures of, the defendant.

*Id.* at 189–90.

■ The court holds that plaintiffs' statistical evidence is not sufficient as a matter of law to establish a violation of section 3605. Plaintiffs' attorneys offered no explanation of the meaning of these figures, they made no attempt to present evidence which would allow the court to draw any inferences from them. This evidence, standing alone, does not establish that race played any part in First Federal's decisions to make loans to people in Gary; no reasonable inferences can be drawn in that direction. Although section 3605's red-lining prohibition makes it illegal to discriminate on the basis of certain characteristics of the plaintiff's neighborhood (*e.g.*, race, color, religion, sex or national origin), there are numerous legitimate business factors that go into a decision to make a loan which do not form the basis of a violation under section 3605. The remarks of the Federal Home Loan Bank Board regarding the Board's regulations and policies in making loans, cited by the court in *Laufman*, are instructive on this point.

There is nothing in the Board's regulations or in the Board's policies which mandates an association to make a bad loan as long as the criteria they use for making the loan are legitimate business criteria, such as the credit worthiness of the borrower, *the marketability, the salability of the security property, including the neighborhood in which it's located which has a bearing on the salability*, the diversification of the institution's assets. All these things are legitimate criteria.

408 F.Supp. at 501. (emphasis added).

■ In determining whether or not to grant a second mortgage to the Thomases,

First Federal considered the loan-to-value ratio of their home. Included in the loan-to-value ratio are considerations of the marketability, the salability and the neighborhood of the property offered as security for the loan. The loan-to-value ratio was the dispositive factor in First Federal's decision to deny the loan. Such a factor is a legitimate business criterion and its use is not a violation of section 3605.

After considering all of plaintiffs' evidence, the court finds that the strength of their statistical evidence was nonexistent; that defendants had a legitimate business interest and basis for denying the loan; and that there was no evidence, apart from the conclusory statements by the Thomases, demonstrating a discriminatory intent on the part of defendants.

The incomplete and disjointed nature of the statistical evidence here fairly characterizes plaintiffs' presentation of their case in general. Throughout the two days of testimony plaintiffs' counsel never articulated a complete and coherent theory of recovery. The erratic nature of their presentation was exacerbated by plaintiffs' counsels' apparent lack of preparation and unfamiliarity with the Federal Rules of Evidence. The court recognizes that the substantive issues in red-lining cases can be complex and are often difficult to prove, especially when a plaintiff relies on statistical evidence. *Phillips v. Hunter Trails Community Ass'n.*, 685 F.2d 184, 189–90 (7th Cir.1982).

But the complaint in this case was originally filed over two years ago, in October of 1984, which means plaintiffs had ample time to adequately prepare for trial. This is especially true because plaintiffs did not spend any time or energy trying to negotiate or otherwise resolve their dispute with First Federal before filing suit. Given the plaintiff Center's stated goal of enhancing the cooperation between the Center and local landlords and financial lending institutions, *Davis v. Mansards*, 597 F.Supp. 334, 348 (N.D.Ind.1984), it would make more sense for the Center to contact a potential defendant at least once in an effort to resolve their dispute before rushing to trial.

Therefore, after taking an unbiased view of all the evidence, direct and circumstantial, and according it such weight as the court believes it is entitled to receive, the court holds that the evidence weighs overwhelmingly in favor of defendants. Accordingly, the court GRANTS defendants judgment on plaintiffs' Fair Housing Act claims.

## B.

### *Equal Credit Opportunity Act*

Plaintiffs also alleged violations of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691 *et seq.* The ECOA provides in pertinent part:

(a) It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction—

(1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract).

15 U.S.C. § 1691 (1982).

Courts and regulations under the ECOA have defined "discriminate" to mean "to treat an applicant less favorably than other applicants." *Anderson v. United Finance Co.*, 666 F.2d 1274, 1276 (9th Cir.1982) (citing 12 C.F.R. § 202.2(n) (1979)).

As discussed earlier, there was no evidence at trial that the Thomases were treated any differently than other loan applicants by Frist Federal. The overwhelming evidence at trial established that First Federal neither intentionally discriminated against the Thomases nor that the effect of First Federal's loan practices had an impermissible adverse impact on black applicants. *See Cherry v. Amoco Oil Co.*, 490 F.Supp. 1026, (N.D.Ga.1980) (applying disparate impact analysis to the ECOA). Accordingly, the court GRANTS defendants judgment on plaintiffs' ECOA claims.

## C.

### *Section 1981 and 1982*

Finally, Thomases alleged that First Federal discriminated against them because of their race violating 42 U.S.C. §§ 1981 and 1982 regarding equal rights under the law. These sections provide:

§ 1981. *Equal rights under the law.* All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

§ 1982. *Property rights of citizens.* All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold and convey real and personal property.

To prevail on a claim under either section 1981 or 1982, plaintiffs must prove intentional discrimination on the part of defendants. *General Building Contractors Assoc. v. Pennsylvania,* 458 U.S. 375, 388–89, 102 S.Ct. 3141, 3148–49, 73 L.Ed.2d 835 (1982); *Svatik,* 779 F.2d at 387; *Kaplan,* 567 F.Supp. at 56. Again, as discussed previously, the evidence at trial made no showing of intentional discrimination on the part of defendants. Because plaintiffs adduced no direct proof of discriminatory intent they seem to rely, once again, on indirect proof. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

The court holds that the overwhelming evidence at trial established that First Federal's loan practices did not have an impermissible adverse impact on black appli-cants. Therefore, the court GRANTS defendants judgment on plaintiffs' section 1981 and 1982 claims.

## CONCLUSION

Based on the foregoing, the court finds that defendants should prevail on all of plaintiffs' claims and it is hereby ADJUDGED that plaintiffs take nothing by their complaint. The Clerk of the Court is directed to ENTER JUDGMENT in favor of defendants.