**Dorothy LARAMORE and other individual plaintiffs on their own behalf and on behalf of all persons similarly situated, and the South Armour Square Neighborhood Coalition, Plaintiffs,**

**v.**

**The ILLINOIS SPORTS FACILITIES AUTHORITY, The City of Chicago, and The Chicago White Sox, Ltd., Defendants.**

**No. 89 C 1067.**

United States District Court, N.D. Illinois, E.D.

Sept. 8, 1989.

---

James P. Chapman, Alan Mills and Kathleen Hogan Morrison, James P. Chapman & Associates, Chicago, Ill., for plaintiffs.

Matthew A. Rooney, Michele L. Odorizzi, Ruth Miller and Diana Runcie, Mayer Brown & Platt, Chicago, Ill., for Illinois Sports Facilities Authority.

Donald E. Egan and Andrew M. Hale, Katten Muchin & Zavis, Chicago, Ill., for Chicago White Sox, Ltd.

Sharon Baldwin, Corp. Counsel's Office–Law Dept., Ed Kus and Judson H. Miner, Corp. Counsel, Chicago, Ill., for City of Chicago.

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

### I. INTRODUCTION

This lawsuit is brought by residents of areas adjoining the site which was selected for a new stadium for the Chicago White Sox baseball team. Plaintiffs allege that the site was selected, and that their neighborhood is accordingly being destroyed, for racially discriminatory reasons. Pending is defendants' motion to dismiss the complaint. For the reasons described below, defendants' motion is granted in part and denied in part.

### II. FACTS

For the purposes of this motion, the Court accepts as true the allegations of plaintiffs' complaint. *See Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Certain factual allegations contained in defendants' memoranda have been used to complete the background discussion, although these allegations are immaterial to resolution of the legal issues.

On January 20, 1987, the Illinois General Assembly enacted the Illinois Sports Facilities Authority Act ("the Act"), Ill.Rev.Stat. ch. 85 § 6001 *et seq.* The Act was amended on June 30, 1987 and on July 7, 1988. The Act was passed to create the Illinois Sports Facilities Authority (the "Authority") and to direct the Authority to build a single stadium for the exclusive use of the Chicago White Sox, Ltd. ("White Sox") in a specific location. (Complaint ¶ 24.). Section 8(6) of the Act, Ill.Rev.Stat. ch. 85 § 6008(6), directs the Authority to determine the location of a new sports facility. Section 12 of the Act, Ill.Rev.Stat. ch. 85 § 6012, specifies the parcels of land which the Authority may condemn. The area covered by these parcels is referred to as South Armour Square. (Complaint ¶¶ 24, 47.) The July, 1988 amendments provided the authority necessary to fund construction of the stadium, and the site acquisition process began immediately thereafter. (Defendant's Memorandum in Support ("Mem.") at 2.)

In order to acquire the site, the Authority found it necessary to displace over 425 black residents of South Armour Square from their residences. (Complaint ¶ 4.) In the summer of 1988, the Authority began negotiating with the homeowners and tenants who lived on the site. (Mem. at 2–3.) Plaintiffs allege that the Authority used high-pressure tactics in these negotiations. (Complaint ¶¶ 44(e), 54.) By September 15, 1988, the Authority had reached a settlement with these residents, pursuant to which the Authority agreed to build new homes for homeowners or pay them fair market value plus a $25,000 bonus, and to pay relocation costs for tenants and give a cash settlement to long-term tenants. (Mem. at 3.) The Authority benefitted from the settlement by avoiding the necessity of condemnation proceedings and by obtaining a covenant not to sue from the South Armour Square Coalition ("Coalition"), which participated in the negotia-

tions with the Authority and which at that time represented both homeowners who were to be relocated and tenants in the neighboring housing that would remain. (Mem. at 3.)

On or about October 14, 1988, the Authority filed an application with the City for an amendment to the City's zoning ordinance. (Complaint ¶ 61.) The application sought a waiver of "virtually every limitation which applied to every other development in the City," including limitations concerning light, heat, noise, smoke, toxic discharge, noxious odors, fire, and explosive materials. (*Id.*) In early November, 1988, without providing meaningful notice to neighboring residents, the Chicago Plan Commission held a "purported" public hearing. (Complaint ¶ 62.) At plaintiffs' insistence, a further hearing was held on November 30. During a final hearing on December 8, despite the belief of many members that the Authority had failed to satisfy concerns about negative effects on plaintiffs, the Plan Commission voted to recommend approval of the application by the City Council, with the suggestion that the City Council require the Authority to address these concerns before the issuance of a building permit. (Complaint ¶ 63.)

The next day, without any meaningful notice to plaintiffs, the Chicago City Council's Committee on Zoning voted to approve the requested zoning amendment. The City Council enacted an amendment substantially identical to the one sought by the Authority on December 21, 1988. (Complaint ¶¶ 64–65.)

The plaintiffs in this case are:

(1) the "class plaintiffs," including (a) individual black persons who live in Wentworth Gardens, a low-rise development adjacent to the stadium site which is operated by the Chicago Housing Authority and the rents of which are federally regulated, (b) individual black persons who live in T.E. Brown Apartments, a federally regulated eleven-story apartment building adjacent to the stadium site, and (c) an alleged class of all persons who live in or have lived in Wentworth Gardens or T.E. Brown Apart-

ments since January, 1987 and who have been harmed or are in danger of being harmed by defendants' allegedly racially discriminatory practices;

(2) the Coalition, a not-for-profit corporation the members of which are residents of Wentworth Gardens and T.E. Brown Apartments, and the goals of which include the preservation of the South Armour Square neighborhood; and

(3) the "Bridgeport plaintiffs," consisting of individual residents, apparently white, who live in the neighborhoods of Bridgeport and Fuller Park near the stadium site.

(Complaint ¶¶ 13–21, 30–32.)

Defendants are the Authority, the White Sox, and the City of Chicago.

Plaintiffs allege that the selection of the stadium site was based on discriminatory motives—that South Armour Square was selected because its residents were almost exclusively black. (Complaint, ¶¶ 3, 44, 45.) Plaintiffs allege that the private homes were essential to the stability of their neighborhood, and that the destruction of these homes and the selection of South Armour Square as the stadium site has caused or will cause them numerous injuries which will make it impossible for them to continue to live in their neighborhood. These injuries include:

(a) Residents of T.E. Brown Apartments and Wentworth Gardens will be subjected to noise, intense lights, and limited access to their residences, their physical security will be jeopardized by strangers, emergency vehicles will have difficulty gaining access to the premises, and a high wall will be constructed which will further segregate and isolate them;

(b) Residents of Wentworth Gardens will lose substantial access to their residences for their own vehicles, will lose access to shopping and other commercial opportunities, and will lose a substantial portion of the neighborhood of which they have historically been a part;

(c) the Bridgeport plaintiffs are in danger of being forced from their homes as the construction of the stadium attracts developers whose purchasing and mar-

keting of homes in their neighborhoods will cause a rise in rental and property tax rates;

(d) plaintiffs' children who attend the Abbott Grammar School near the stadium will be subjected to the noise and harassment of the sporting events which will occur at the stadium and will be endangered by the presence of strangers;

(e) several businesses in the area have been destroyed, with a concomitant loss of employment opportunities, and many other businesses will be forced to move;

(f) South Armour Square residents will be further isolated from the residents and neighborhood services of Bridgeport;

(g) due to the destruction of businesses in South Armour Square, the class plaintiffs must now shop by either crossing the Dan Ryan Expressway and traversing large tracts of public housing, or by entering the Bridgeport neighborhood where black persons are periodically subjected to verbal and physical attacks; and

(h) the Coalition has suffered a dramatic decrease in membership and has been hampered in the achievement of its goals of commercial and residential development and economic development.

(Complaint ¶¶ 4, 69–73.)

Plaintiffs brought this lawsuit on February 9, 1989. Count I alleges that defendants' conduct violates the equal protection clause of the Fourteenth Amendment of the U.S. Constitution and 42 U.S.C. § 1983. Count II alleges a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. Count III alleges a violation of Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601, *et seq.* Count IV alleges that the Ordinance is arbitrary and capricious in violation of the Chicago Zoning Ordinance and Article 1, Section 2 of the Illinois Constitution. As relief, plaintiffs seek a declaration that the amendatory zoning is null and void, an injunction forbidding defendants to proceed with the new stadium, an injunction requiring defendants to replace the South Armour Square homes which the Authority has acquired and destroyed, and compensatory and puni-

tive damages. The Court has participated in several settlement conferences with the parties, but the negotiations have been fruitless. The Court therefore proceeds to consider defendants' motions to dismiss.

## III. STANDING

Defendants' standing argument is not so much an argument that the case should be dismissed for reasons of standing but rather that when plaintiffs' complaint is narrowed as required by standing doctrine, it fails to state a claim.

The standing doctrine has been summarized as follows:

[T]he first step in the standing inquiry is to determine whether a plaintiff has constitutional standing to sue in federal court. To do so, the plaintiff must allege "[1] a personal injury [2] fairly traceable to the defendant's allegedly unlawful conduct and [3] likely to be redressed by the requested relief." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)....

The next step of the standing inquiry is to determine whether the plaintiff's claims run afoul of any of the federal judiciary's prudential standing limitations, most commonly articulated in three general principles. First, if the plaintiff's asserted harm is a "generalized grievance" shared by all or a large class of citizens, that harm alone. normally does not warrant exercise of jurisdiction. [*Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).] Second, the plaintiff generally must assert her own legal rights and interests; she cannot rest her claim to relief on the legal rights or interests of third parties. *Id.* Finally, the plaintiff's complaint must fall within the "zone of interests" to be produced or regulated by the statute or constitutional guarantee in question. *Valley Forge* [*Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 475, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982)].

*FMC Corp. v. Boesky,* 852 F.2d 981, 987–88 (7th Cir.1988).

■ Defendants' primary argument is that plaintiffs cannot sue to enforce the rights of the homeowners who sold their homes to the ISFA. Defendants thus focus on the second prudential standing limitation identified in *FMC Corp.* Plaintiffs respond that they are not seeking to enforce the rights of third parties, but only to enforce their own rights. The complaint is not always unambiguous as to whether it alleges that the stadium site was selected solely because the South Armour Square residents who have now been displaced are black or also because the residents in adjacent areas (the class plaintiffs herein) are black. In their brief, plaintiffs argue that the complaint alleges that defendants targeted the "neighborhood" because its residents (including both the displaced residents and the class plaintiffs) were black. This description is consistent with a liberal reading of the complaint, and the Court accepts this reading.

The class plaintiffs charge that they have been injured by the destruction of their neighborhood on account of their race. The Coalition alleges that discrimination by defendants has injured the Coalition's own ability to achieve its goals. *Cf. HOPE, Inc. v. County of DuPage*, 738 F.2d 797, 813 (7th Cir.1984). The Bridgeport plaintiffs assert that discrimination by defendants will have the effect of forcing them from their homes. These are all allegations which, if they do state claims for relief, involve the rights of plaintiffs themselves rather than the rights of the homeowners. The Court agrees with plaintiffs that the limitation on assertion of rights of third parties does not impinge on plaintiffs' claims.

■ Defendants also argue that the Bridgeport plaintiffs fail to satisfy the second and third prongs of the constitutional standing inquiry—that their injury is caused by defendants' conduct and that they would benefit from the requested relief. (Mem. at 10 n. 8.) The Court disagrees. The Bridgeport plaintiffs have adequately alleged that they will be forced from their homes by increased living costs accompanying gentrification. (Complaint,

¶¶ 71–73.) They have adequately alleged that this injury will result from construction of the stadium at the planned site and that the injunctive relief sought would provide a remedy for this injury. It may well be that the Bridgeport plaintiffs will be unable to prove their allegations. However, it is not appropriate, in the context of a motion to dismiss, to consider whether such proof is likely. Plaintiffs should be given the opportunity to gather their evidence and present it in the context of trial or a summary judgment motion.

As noted above, defendants primarily argue that the standing doctrine should be invoked to narrow plaintiffs' claims before proceeding to consider whether the complaint states a claim for relief. Having considered the standing issues, the Court proceeds to examine the causes of action asserted by plaintiffs.

## IV. EQUAL PROTECTION

Count I of the complaint alleges that defendants' conduct constitutes intentional discrimination on account of race in violation of the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983. Defendants argue that this claim is deficient for several reasons.

First, defendants argue that the Bridgeport plaintiffs, who apparently are predominantly white, have not alleged that they are members of a protected class. (Mem. at 12.) Defendants concede that white individuals may be victims of racial discrimination. However, defendants argue that plaintiffs' complaint alleges that defendants' conduct constituted discrimination against blacks, and that the same conduct cannot have been both discrimination against blacks and discrimination against whites. Although defendants raise this argument as one concerning whether a claim has been stated, the argument appears to be one that concerns the third prudential limitation on standing—*i.e.*, whether the white plaintiffs' complaint falls within the "zone of interests" to be protected by the equal protection clause and 42 U.S.C.

§ 1983.[1] *Cf. Munoz–Mendoza v. Pierce,* 711 F.2d 421, 426 (1st Cir.1983) (allegation of injury similar to that alleged by the Bridgeport plaintiffs was too speculative to confer standing). Neither party has submitted substantial argument on this issue. It is the parties' responsibility to brief the issue in the first instance, and the Court hesitates to determine, without the parties' input, whether the Bridgeport plaintiffs' allegations fail to state a claim or fail for lack of standing. The Court thus denies defendants' motion to dismiss the Bridgeport plaintiffs' claim without prejudice; if defendants wish to press this issue, the Court will accept further briefing.[2]

Defendants' second argument is that plaintiffs have not even alleged that defendants' conduct has resulted in a racially disparate impact. (Mem. at 13.) Defendants point out that plaintiffs allege adverse effects which extend to both black and white individuals. However, as defendants admit, the alleged effects on lacks are much more direct and immediate. In light of the difference between the alleged immediate impact on lack plaintiffs—the destruction of vital portions of their neighborhood—and the indirect and, perhaps, speculative impact on white plaintiffs, the Court finds that plaintiffs have adequately alleged a racially disparate impact.

Defendants' third argument—and the primary focus of their motion—is that plaintiffs have not adequately alleged the element of discriminatory intent. *See Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979) (a neutral law which has a disproportionate effect on a racial minority is unconstitutional only if the impact can be traced to a discriminatory purpose); *Arlington Heights v. Metro-*politan *Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (same); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (same).

In *Arlington Heights,* the Supreme Court discussed the factors which may bear on the determination of whether an action grew out of a discriminatory purpose:

The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. The specific sequence of events leading up [to] the challenged decision also may shed some light on the decisionmaker's purposes.... Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decision maker strongly favor a decision contrary to the one reached.

The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports....

The foregoing summary identifies, without purporting to be exhaustive, subjects of proper inquiry in determining whether racially discriminatory intent existed.

429 U.S. at 267–68, 97 S.Ct. at 564–65 (citations omitted).

■ Plaintiff's complaint alleges that defendants' conduct was motivated by discriminatory intent, and in support of this

---

**1.** Contrary to defendants' assertion in their reply brief that "plaintiffs apparently do not dispute that the Bridgeport and Fuller Park plaintiffs do not have standing if the *prudential* limitations of *Warth v. Seldin* are applied" (Reply at 13) (emphasis added), defendants raised only the *constitutional* standing limitations in their opening brief (Mem. at 10 n. 8). That argument was rejected *supra* at 448.

**2.** If indeed defendants' argument is one of standing rather than failure to state a claim,

resolution of the issue may be unnecessary in light of the Court's ruling that the other plaintiffs have standing. *See Watt v. Energy Action Educational Foundation,* 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1982); *Block v. Meese,* 793 F.2d 1303, 1307 (D.C.Cir.), *cert. denied,* 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986); *Simpson v. Miller,* 535 F.Supp. 1041, 1044–45 n. 4 (N.D.Ill.1982). If defendants elect to press their argument, they should address this issue.

allegation the Complaint alleges the following circumstances:

a) defendants' choice to build the stadium on a site populated exclusively by black persons, when they could have selected a site north of the existing stadium, adjacent to a white community, which would not require the destruction of any houses (Complaint ¶¶ 5, 48);

b) a historical background of racial discrimination since 1945 by the City and local governmental agencies which has resulted in the segregation and isolation of black persons in South Armour Square; this background includes segregation in public housing and the relocation of the Dan Ryan expressway to create a buffer area to restrain the movement of black persons (Complaint ¶¶ 35-43);

c) procedural irregularities in the selection of the stadium site, including the decision to build the new stadium before the date that an engineering analysis of the existing stadium was due; the lack of a study or public hearing concerning costs and benefits; and approval of the zoning amendment by the Committee on Zoning of the City of Chicago Council before any opportunity to review the evidence considered by the Plan Commission (Complaint, ¶¶ 50, 51, 66); and

d) substantive irregularities, including extraordinarily generous terms in the lease granted to the White Sox by the Authority, the exemption of the White Sox from various taxes and regulations, the delegation of enormous discretion to non-elected members of the Authority, and the elimination with respect to the stadium of the detailed performance standards of the Chicago Zoning Ordinance. (Complaint, ¶¶ 52, 53, 67).[3]

Defendants argue that plaintiffs' allegations cannot support a finding that defendants' actions were motivated by discrimi-

natory intent. For instance, defendants argue that any historical background of racial discrimination is irrelevant in light of the changed political situation in which, by the time the stadium site was selected, black persons were no longer excluded from the political process in the City of Chicago and State of Illinois. Pointing to the existence of a black mayor and substantial black representation in the City Council at the time of the decisions in question, defendants argue that it is impossible to infer racial animus from these decisions. Defendants also argue that the procedural and substantive irregularities identified by plaintiffs do not indicate racial animus, but evidence only plaintiffs' displeasure with the General Assembly's decision to subsidize a new stadium in order to keep the White Sox in Chicago.

Although defendants point out difficulties which plaintiffs may encounter in their attempt to *prove* discriminatory intent, the Court does not find that dismissal of the complaint on this ground is warranted. The existence of intent is a question of fact, determination of which on the pleadings is generally inappropriate. *See Askew v. Bloemker*, 548 F.2d 673, 679 (7th Cir. 1976) (cases involving intent are generally inappropriate for summary judgment); *Sieber v. Wigdahl*, 704 F.Supp. 1519, 1523 (N.D.Ill.1989) (same). Plaintiffs need not, in their complaint, identify with particularity every piece of evidence which they believe will support a finding of discriminatory intent. The allegations of plaintiffs' complaint in this case suffice to state a claim for intentional discrimination in violation of the equal protection clause.

■ Defendants further argue that the wisdom of state and local governments' use of their eminent domain powers is beyond the authority of a federal court to review, citing *City of Memphis v. Greene*, 451 U.S. 100, 127, 101 S.Ct. 1584, 1600, 67 L.Ed.2d

---

3. Plaintiffs also argue that there is direct evidence of racial animus in that one condition demanded by the White Sox in its simultaneous negotiations with St. Petersburg, Florida was the removal of a nearby public housing project populated by Black persons. (Response at 21.) Because the Court has been unable to find such

an allegation in plaintiffs' complaint, it cannot consider it in connection with its ruling on defendants' motion to dismiss. *See Rodgers v. Lincoln Towing Service, Inc.*, 771 F.2d 194, 198 (7th Cir.1985). However, as noted below, plaintiffs need not set out all of their evidence in their complaint.

769 (1981); *Nashville I–40 Steering Committee v. Ellington,* 387 F.2d 179, 185 (6th Cir.1967), *cert. denied,* 390 U.S. 921, 88 S.Ct. 857, 19 L.Ed.2d 982 (1968); and *Green Street Ass'n v. Daley,* 373 F.2d 1 (7th Cir.), *cert. denied,* 387 U.S. 932, 87 S.Ct. 2054, 18 L.Ed.2d 995 (1967). In *Memphis,* the Supreme Court held that the district court had no authority to review the wisdom of a city's policy decision concerning a road closing where there was no basis for concluding that the city's asserted reasons were contrived or pretextual. In *Nashville,* the court held that a decision concerning a highway route would not be second-guessed by a federal court in the absence of discriminatory intent. Neither *Memphis* nor *Nashville* supports an argument that a federal court should not review a decision which was allegedly based on discriminatory intent. In *Green Street,* the court held that constitutional claims concerning the method in which the city exercised its eminent domain powers should be raised in the state court condemnation proceedings rather than in federal court. *Green Street* was decided before much of the development of the applicable case law on equal protection claims, and in any event it does not apply here, where there are no pending or expected condemnation proceedings against plaintiffs. *Cf. Ahrensfeld v. Stephens,* 528 F.2d 193 (7th Cir.1975) (federal court would abstain from interfering with pending condemnation proceeding in which the plaintiffs' constitutional claims could be raised); *Dash v. Frech,* No. 88 C 5001, 1989 WL 75422 (N.D.Ill. June 20, 1989) (same). The Court finds no reason to dismiss an otherwise properly pleaded equal protection claim on the sole ground that the challenged actions concern issues of land use and eminent domain.

## V. TITLE VI

■ In Count II of their complaint, plaintiffs claim a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. This statute provides:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

The purpose of Title VI was "to halt federal funding of entities that violate a prohibition of racial discrimination similar to that of the Constitution." *Regents of Univ. of California v. Bakke,* 438 U.S. 265, 284, 98 S.Ct. 2733, 2745, 57 L.Ed.2d 750 (1978). Defendants argue that Count II must be dismissed for three reasons: there is no allegation of federal financial assistance; plaintiffs lack standing; and plaintiffs fail sufficiently to allege intentional discrimination.

■ The Court agrees with defendants that plaintiffs have failed to allege federal financial assistance. No such assistance is alleged anywhere in plaintiffs' complaint. In their brief in response to defendants' motion to dismiss, plaintiffs argue that the federal financial assistance is found in a federal tax exemption for bonds sold by the ISFA to finance the stadium. *See* Public Law 99–514 § 1317(3), 26 U.S.C. § 141 note. In support of their argument that such a tax exemption constitutes federal financial assistance for Title VI purposes, plaintiffs cite *McGlotten v. Connally,* 338 F.Supp. 448 (D.D.C.1972), which held that certain tax deductions constituted federal financial assistance where those deductions met certain criteria. Plaintiffs also argue in their response brief that they "believe that discovery will disclose that substantial work on the stadium project was performed by personnel of the City's Department of Planning whose salaries are funded by the federal Community Development Block Grant program." The Court does not reach the issue of whether either of these sources rises to the level of federal financial assistance necessary to make Title VI applicable. Neither of these sources of federal benefits is alleged in plaintiffs' complaint, and the Court may not consider allegations which lie outside of the complaint in ruling on a motion to dismiss. *Rodgers v. Lincoln Towing Service, Inc.,* 771 F.2d 194, 198 (7th Cir.1985). Because plaintiffs allege no source of federal finan-

cial assistance in their complaint, Count II must be dismissed.

■ As an alternative ground for dismissal, the Court agrees with defendants that plaintiffs have not established standing to sue under Title VI. "[T]o bring a private action under [Title VI], the plaintiff must be the intended beneficiary of, an applicant for, or a participant in a federally funded program. The legislative history of Title VI also lends strong support to the conclusion that Congress did not intend to extend protection under Title VI to any person other than an intended beneficiary of federal financial assistance." *Simpson v. Reynolds Metals Co., Inc.*, 629 F.2d 1226, 1235 (7th Cir.1980) (citations omitted). In this case, even if plaintiffs properly alleged the two sources of federal benefits described in their response brief, and even if the Court were to find that those benefits constituted federal financial assistance, plaintiffs are not the intended beneficiaries of those benefits. Plaintiffs thus do not have standing to bring an action under Title VI.

For these alternative and independent reasons, the Court grants defendants' motion to dismiss Count II of plaintiffs' complaint.[4]

## VI. TITLE VIII

■ Count III of plaintiff's complaint is brought under Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601–3619 (the Fair Housing Act). The operative language of this statute makes it unlawful:

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

(b) To discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, or national origin. . . .

42 U.S.C. § 3604.

Plaintiffs' complaint does not make clear which provision of the statute they allege to have been violated by defendants' conduct, but in their response to defendants' motion to dismiss, plaintiffs assert that defendants' isolation of plaintiffs from their neighbors and from shopping and other services constitutes discrimination in the provision of services or facilities in connection with the sale or rental of a dwelling, in violation of § 3604(b).

The Court agrees with defendants that plaintiffs' allegations do not state a claim within the purview of § 3604(b). The scope of § 3604(b) depends on whether the language "in connection with" refers to the "sale or rental of a dwelling" or more broadly to a "dwelling." The Court finds that the most natural reading of the statute is the narrower reading. *See Southend Neighborhood Improvement Ass'n v. County of St. Clair*, 743 F.2d 1207, 1210 (7th Cir.1984) (§ 3604(b) prohibits "discrimination in the provision of services or facilities in connection with the sale or rental of a dwelling"). Even under a broad reading, however, "services or facilities" refers to "services generally provided by governmental units such as police and fire protection or garbage collection." *Id.* Section 3604(b) cannot be extended to a decision such as the selection of a stadium site and plaintiffs therefore do not state a cause of action under Title VIII.[5]

## VII. LACHES

Finally, defendants argue that plaintiffs' claims for injunctive relief should be denied on the ground of laches. Laches bars a

---

**4.** Because the Court's findings with respect to federal financial assistance and standing warrant dismissal of Count II, the Court does not reach the issue of whether the allegations of discrimination suffice to state a claim under Title VI.

**5.** The result would be the same if plaintiffs relied on § 3604(a) rather than § 3604(b). Sec-

tion 3604(a) concerns only "the *availability* of housing." *Southend*, 743 F.2d at 1209–10. *See also Burrell v. City of Kankakee*, 815 F.2d 1127, 1130–31 (7th Cir.1987); *Evans v. First Federal Savings Bank*, 669 F.Supp. 915, 923 (N.D.Ind. 1987); *Thomas v. First Federal Savings Bank*, 653 F.Supp. 1330, 1337 (N.D.Ind.1987).

claim for equitable relief where the defendant proves "(1) lack of diligence by the party against whom the defense [of laches] is asserted, and (2) prejudice to the party asserting the defense." *Farries v. Stanadyne/Chicago Division*, 832 F.2d 374, 378–79 (7th Cir.1987), quoting *Costello v. United States*, 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961).

Defendants argue that plaintiffs could have brought their lawsuit on September 15, 1988, by which time all of the homeowners had agreed to sell their homes to the Authority. Instead, plaintiffs waited for five months before filing this action. In the meantime, the homeowners have left, their homes were demolished, construction of replacement housing began, and the Authority spent $20 million in performance of its obligations.

Plaintiffs initially respond that consideration of defendants' arguments, which go beyond the face of the complaint, is inappropriate in the context of a motion to dismiss. Plaintiffs further respond that they did not fail to act diligently. They argue that their claim was not ripe until December 21, 1988, when the City enacted the zoning amendment which gave the Authority the right to construct a stadium in South Armour Square. Plaintiffs also assert that between September 15 and December 21, 1988, plaintiffs repeatedly made known their intent to file this lawsuit. Finally, plaintiffs argue that any prejudice suffered by the Authority was caused not by plaintiff's delay in filing suit but by the Authority's own conduct in beginning the acquisition and demolition process before it had obtained the necessary zoning amendment from the City.

■ The Court agrees with plaintiffs that materials beyond the face of the complaint should not be considered in connection with defendants' motion to dismiss the complaint on the ground of laches. *See, e.g., Bachmeier v. Bank of Ravenswood*, 663 F.Supp. 1207, 1211 (N.D.Ill.1987) (dismissal appropriate where affirmative defense is apparent from face of complaint, but not where a disputed factual issue underlies the defense); 5 Wright & Miller, *Federal Practice and Procedure*, § 1357 at 605–06 (1969) (complaint is subject to dismissal "when its allegations indicate the existence of an affirmative defense, but the defense must clearly appear on the face of the pleading"). The Court could exercise its discretion under Fed.R.Civ.P. 12(b) and convert the motion to dismiss into a motion for summary judgment, giving the parties a reasonable opportunity to submit further evidence. The Court declines to do so. If defendants wish to move for summary judgment on this issue, they may do so; the Court expresses no opinion as to the merits of such a motion.[6] The Court does find that, looking solely at the allegations of the complaint, defendants have not sustained their burden of proving that plaintiffs' claims for injunctive relief are barred as a matter of law.

## VIII. CONCLUSION

For the reasons described above, defendants' motion to dismiss is granted as to Counts II and III and denied as to Count I. Because a federal claim survives, the Court declines to dismiss Count IV, the state law claim.[7]

---

**6.** The Court also expresses no opinion as to whether any request for injunctive relief at this stage would be barred by laches due to plaintiffs' failure to seek injunctive relief immediately upon the filing of this lawsuit. Although defendants have hinted at such an argument, this issue is not raised in their motion to dismiss.

**7.** With respect to Count IV, defendants argue that it should be dismissed if the other counts are dismissed. Defendants also rely on *Green Street Ass'n v. Daley*, 373 F.2d 1 (7th Cir.1967), which the Court has held is not controlling here. *See supra* at 451.