Mary L. CARTWRIGHT & The Northwest Indiana Open Housing Center, Plaintiffs–Appellants,

v.

AMERICAN SAVINGS & LOAN ASSOCIATION, Defendant–Appellee.

No. 88–1593.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 19, 1989.

Decided July 14, 1989.

Jerry T. Jarrett, Hammond, Ind., for plaintiffs-appellants.

Harold Abrahamson and Mark Dvorscak, Hammond, Ind., for defendant-appellee.

Before CUDAHY, COFFEY and EASTERBROOK, Circuit Judges.

COFFEY, Circuit Judge.

The plaintiffs-appellants Mary Cartwright and the Northwest Indiana Open Housing Center commenced a suit alleging that the defendant-appellee American Savings & Loan Association ("American Savings") refused to approve an application for a home construction loan in 1980 because of Mary Cartwright's race and sex and engaged in "redlining" in the neighborhood where Mrs. Cartwright intended to build,[1] in violation of the Fair Housing Act (42 U.S.C. §§ 3604 and 3605), the Equal Credit Opportunity Act (15 U.S.C. § 1691) and civil rights statutes (42 U.S.C. §§ 1981 and 1982). American Savings moved for involuntary dismissal pursuant to Fed.R.Civ.P. 41(b), arguing that the facts and the law

1. "Redlining" means "mortgage credit discrimination based on the characteristics of the neighborhood surrounding the would-be borrower's dwelling." *Thomas v. First Fed. Sav. Bank of Indiana,* 653 F.Supp. 1330, 1337 (N.D.Ind.1987).

presented during the court trial failed to establish a right to relief. The district judge agreed. We affirm.

## I.

On August 24, 1965, the plaintiff-appellant Mary Cartwright, a black female, and her first husband, Shishmon Bailey, obtained a mortgage loan from the defendant-appellee American Savings for a single-family residence at 5901 Columbia Avenue, Hammond, Indiana. Some twelve years later, on December 5, 1977, American Savings approved a second mortgage on the same real estate at 5901 Columbia in the amount of $15,000.

On or about July 10, 1980, Mary Cartwright and her second husband, Lawrence Cartwright, purchased lots 29 through 33 at 1112 Merrill Street in the East Hammond (Indiana) urban renewal area. The Cartwrights purchased the property from the City of Hammond for $1.00 per lot, conditioned upon the Cartwrights constructing only a single-family residence.

On August 28, 1980, Mary and Lawrence Cartwright applied for a $90,000 home mortgage loan from American Savings to finance the construction of a home on the Merrill Street property.[2] The Cartwrights estimated the approximate value of their new residence at $91,250. Louis Green, vice-president of American Savings charged with mortgage loan responsibility, accepted the Cartwrights' application on August 28, 1980, and collected their application fee of $190.00 for a credit check and an appraisal of the building venture.

Mary Cartwright and Louis Green's testimony differed as to the events following their initial August 28, 1980, meeting. Green testified that he took the Cartwrights' loan application on August 28, 1980, and ordered a credit check and an appraisal of their anticipated Merrill Street building venture.[3] Green further testified that Mrs. Cartwright called him twice in the months following their August 28, 1980, meeting concerning her loan application. According to Green, the first contact occurred in early September 1980, when the appellant called Green inquiring about the status of the loan and Green stated he found the credit report on file, but noted that the appraiser Lee had not as of that date filed his completed property appraisal. Green told the appellant that he would check the status of the appraisal and advise her. Green telephoned Vernon Lee & Associates and was informed that the appraisal was delayed because "they were having problems finding homes of comparable value in that particular area."[4] Green testified:

"So I called Mrs. Cartwright back, and Mrs. Cartwright, after explaining to her that we were having a little difficulty in finding market comparables, said to me, 'Well, I have several friends of mine that are in the process of building homes like or larger than this.'

And I asked her, 'Could you possibly get us some information to that effect, something that we'd have a handle on

---

2. Mary and Lawrence Cartwright divorced approximately six months after the filing of the loan application. Lawrence Cartwright has never been a party to this suit.

3. Vernon E. Lee & Associates, retained by American Savings as an appraiser on a regular basis, was given the assignment.

4. James Lee, the partner at Vernon Lee & Associates responsible for the Cartwrights' appraisal, testified that he looked for existing homes of comparable value as part of the "market approach" of appraisal, which requires "home[s] that would be in the same development that would have similarities and physical characteristics in terms of size, design, utility, and so forth; homes that had sold recently that could be used for comparison...." He also stated

that if there is a comparable home under construction or about to begin construction in an area, he "would use it as a comparable if I could get enough data to apply...." He further stated that he had been unable to establish the market value of the Cartwrights' property and proposed home due to the lack of comparable existing or proposed homes in the East Hammond urban renewal area. He said he performed the Cartwrights' appraisal based upon the "cost approach" of valuation (according to the Cartwrights' appraisal report, the "cost approach" was the appraiser's estimate of the cost of building the proposed home, plus the value of the property), and that Vernon Lee & Associates submitted the appraisal to American Savings on or about September 11, 1980.

the market in that particular area?' And she said, 'I'll be happy to do that.' And I said, 'You can either get it to me or get it to Vern Lee, his office,' and I—I assume I told her where his office was."

Green also stated that Mary Cartwright thereafter failed to communicate the comparable housing information she had agreed to provide and that he was awaiting the information to allow American Savings' loan committee "to make a decision on the loan, to put as much information as we can get to them." He further testified that because Mrs. Cartwright failed to provide the comparable housing information, he was unable to submit the Cartwrights' 1980 loan application to American Savings' loan committee for approval or rejection.

Green stated that he had another conversation with the appellant in March of 1981 when she called and said that she was still interested in building on the Merrill Street site, but that she was having some "personal problems" and had to work them out first. He testified he had no further contact with Mrs. Cartwright until May 1982.

Mary Cartwright's testimony contrasted with Green's in that she stated that Green asked her during their initial August 28, 1980, meeting if she could obtain information regarding the value of comparable homes in the vicinity of the Cartwrights' Merrill Street property, and that she never told Green that she would do so. Her ex-husband, Lawrence Cartwright, corroborated her testimony that she did not agree to provide the information during the meeting on August 28. Further, Mary Cartwright testified that she contacted Green four times in the two months following their August 28, 1980, meeting each time inquiring into the status of the loan application. She stated on each occasion Green informed her he was "working on it" and would get back to her, but failed to do so. She denied having any contact with Green

from November 1980 to April 1982; denied requesting that American Savings put her 1980 loan application "on hold" during that period; and also denied advising Green of any "personal problems." Finally, she stated that she had called the Northwest Indiana Open Housing Center complaining about American Savings' treatment of her 1980 loan application after Green advised her during the April 22, 1982, telephone conversation that her application had not been completed because of her failure to forward the comparable housing information she had volunteered to provide.[5]

It is undisputed that Green and Mrs. Cartwright had telephone conversations on May 4 and May 14, 1982. Mary Cartwright tape-recorded both of these conversations without Green's knowledge or consent.[6] According to the transcript of the May 4 conversation, Green informed Mrs. Cartwright that her 1980 loan application "just died a natural death" because she failed to provide American Savings with the comparable housing information as she had agreed. The appellant also told Green during the May 4 conversation that she was no longer married to Lawrence Cartwright[7] and therefore was interested in building a more modest home (costing $80,000 rather than $90,000 as originally contemplated) on the Merrill Street site. Green advised her that she would thus be required to file a new loan application. The May 4 transcript also reveals that the appellant inquired of Green regarding the availability of financial assistance for low income borrowers, and Green told her that bond money was available through the Indiana Housing Authority, and that (unlike American Savings) another local financial institution, the Lake Mortgage Company, was participating in the bond program. According to the transcript of the May 14, 1982, telephone conversation, Green and the appellant arranged to meet at American Savings on

5. Louis Green could not recall the alleged April 22, 1982, telephone conversation.

6. Mary Cartwright testified that she recorded the conversations without any urging from the Northwest Indiana Open Housing Center. The conversations were later transcribed.

7. The record discloses that the Cartwrights separated in October 1980 and were divorced on February 3, 1981, giving credence to and thus serving to corroborate Green's testimony that Mrs. Cartwright informed him in March 1981 that she was having "personal problems."

May 28, 1982, so the appellant could file a new home loan application.

Both Green and Mary Cartwright testified that Green advised the appellant during the May 28, 1982, meeting that interest rates were extremely high (17½ percent) at the time and that it would be more economically advantageous for her to sell her home rather than offer it for rent and apply the sale proceeds toward the construction costs of her proposed new Merrill Street residence. Green also reiterated that Mrs. Cartwright could apply for Indiana Housing Authority bond money through the Lake Mortgage Company. The appellant testified that Green also told her during this meeting that she should sell her Columbia Avenue home because "being a woman you can't take care of two properties." Although Green and Cartwright arranged the May 28, 1982, meeting so Cartwright could file a new loan application, she chose not to complete an application at that time but did file a new loan application in early October 1982, which American Savings approved on November 22, 1982.[8] Mary Cartwright had no contact with Green or American Savings between the May 28, 1982, meeting and the commencement of this suit on August 27, 1982.

The trial court resolved the conflicts in the Louis Green and Mary Cartwright testimony in favor of Green, finding initially that Mary Cartwright "volunteered" to supply American Savings with information regarding comparable homes in the vicinity of the Cartwrights' Merrill Street property, and secondly, that Mary Cartwright told Green in late 1980 or early 1981 that she was in fact having "personal problems" and stated she would get back to him. The court also found as follows:

**8.** Mrs. Cartwright chose not to accept the American Savings loan approved in November 1982, but instead financed her new home through the Lake Mortgage Company.

**9.** At all relevant times, Section 3605 made it unlawful for any lending institution
"to deny a loan or other financial assistance to a person applying therefore for the purpose of purchasing, constructing, improving, repairing, or maintaining a dwelling, or to discriminate against him in the fixing of the

"At all times relevant hereto, Mary Cartwright was a creditworthy individual and her credit history with American Savings was considered good. She had been a customer of American Savings since at least August of 1965. Mrs. Cartwright was and is an articulate and intelligent person.

\*      \*      \*      \*      \*      \*

American Savings did not reject or otherwise turn down or deny the loan application of Mary and Lawrence Cartwright.... Mary Cartwright was not required by American Savings to provide American Savings with the values of homes being built and (sic) the redevelopment area of Hammond ... American Savings' treatment of Mary and Lawrence Cartwrights' 1980 loan application was not based upon the race of Mary and/or Lawrence Cartwright and the racial character of the community in which they intended to build. American Savings' treatment of Mary Cartwright's loan inquiries in 1982 was not based upon Cartwright's race and/or sex or the racial character of the community in which she intended to build. American Savings has not engaged in the practice of 'redlining' in the central Hammond area, and has in fact provided a significant number of mortgage loans in this area."

In its conclusions of law, the trial court stated that the appellants failed to make out a prima facie case under § 3605 of the Fair Housing Act (42 U.S.C. § 3601 *et seq.*), captioned "Discrimination in financing of housing,"[9] initially stating:

"There is no evidence indicating that American Savings rejected or otherwise denied the August 1980 application. This application, because of lack of com-

amount, interest rate, duration, or other terms or conditions of such loan or other financial assistance, because of the race, color, religion, sex, or national origin of such person...."
Congress amended the Fair Housing Act, including §§ 3605 and 3604 (*infra* n. 9), effective September 13, 1988. Because the alleged discrimination at issue here occurred prior to amendment of the Act, the amendments do not affect resolution of this appeal.

munication, inconsistent positions taken by Mrs. Cartwright, and total misunderstanding, went into abeyance and into limbo. Therefore, the plaintiffs have not proved that the loan was rejected ...," as § 3605 requires. The court also concluded that American Savings did not discriminate against Mary Cartwright and require that she (unlike other borrowers) provide comparable housing information, because "Mary Cartwright volunteered to provide the comparable housing information." Lastly, the court concluded that American Savings did not engage in "redlining" within the meaning of § 3605 because

"[T]he plaintiffs' evidence fails to offer a comparison between American Savings and other lending institutions; the relevant amount of total mortgage activity in all relevant areas; the number of mortgage applications received by American Savings, and the number of those applications rejected or withdrawn; or a relationship of comparable transactions from areas other than the area where the Cartwrights intended to build. This raw data does not establish that American Savings has engaged in any form of redlining."

In addition, the trial court found that the appellants' claims "do not fall within the ambit of" § 3604 of the Fair Housing Act, captioned "Discrimination in sale or rental of housing," [10] because § 3604 applies to discrimination in the *sale or rental* of housing rather than discrimination in the *financing* of housing, as the appellants alleged. The trial court also concluded that the appellants' claims under the Fair

Housing Act were barred by the 180–day statute of limitations contained in the Act, reasoning that the alleged discriminatory conduct at issue occurred between August 28, 1980, and February 3, 1981, or more than 180 days before the appellants filed their complaint on August 27, 1982.[11] With respect to the appellants' claims under the Equal Credit Opportunity Act (15 U.S.C. § 1691),[12] the court found no violation, stating:

"With respect to the August 1980 application, there was no evidence of discrimination by the defendant. As discussed previously, the application went into abeyance because of the total lack of consistent communication and understanding between Mrs. Cartwright and Mr. Green. Such lack of communication does not amount to discriminatory conduct by American Savings. Also, the application was not rejected and therefore no adverse action was taken with respect to the loan.

With respect to the 1982 transaction, there has also not been a violation of the Equal Credit Opportunity Act. There is no evidence of race or sex discrimination regarding this transaction. Mrs. Cartwright never applied for a mortgage in early 1982 from American Savings."

The district court also denied relief under 42 U.S.C. §§ 1981 and 1982 because the appellants failed to establish to the court's satisfaction that American Savings intentionally discriminated against Mary Cartwright.

Lastly, the trial court ruled that the Northwest Indiana Open Housing Center was not entitled to relief under its theory

10. At all relevant times, Section 3604 provided in relevant part that it shall be unlawful

"(a) to refuse to sell or rent after the making of a bonafide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

(b) to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, or national origin."

11. The court reasoned that the alleged discriminatory conduct must have occurred between August 28, 1980, and February 3, 1981, because the Cartwrights were separated and divorced during this period and "Sometime in the fall of 1980, Mrs. Cartwright placed this application on a pending basis due to personal problems."

12. Section 1691 makes it unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction, on the basis of race, color, religion, national origin, sex or marital status, or age. See *infra* pp. 925–26.

that American Savings' discriminatory treatment of Mary Cartwright impaired its mission of eliminating housing discrimination in Northwest Indiana because "the Northwest Indiana Open Housing Center has failed to demonstrate that it suffered any injury from acts of the defendant." [13]

## II.

The plaintiffs-appellants challenge certain findings of fact and conclusions of law relating to each of the causes of action contained in their complaint.

### § 3605 of the Fair Housing Act

■ After weighing the evidence the trial court determined that the appellants had failed to establish a prima facie case under § 3605 of the Fair Housing Act, "Discrimination in financing of housing." (see *supra* note 9). Initially, the appellants argue that the court erred in considering whether they had met the standard for this presentation of a prima facie case, under *Sanders v. General Serv. Admin.*, 707 F.2d 969 (7th Cir.1983). In *Sanders*, we stated that the district court, in deciding a Rule 41(b) motion, "is not to make any special inferences in the plaintiff's favor *nor concern itself with whether the plaintiff has made out a prima facie case.* Instead, the court is to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies." (emphasis added) (*Cf. Ford v. Childers*, 855 F.2d 1271, 1273–74 (7th Cir.1988), explaining standard on motion for a directed verdict under Fed.R.Civ.P. 50(a).) The district court cited the *Sanders* language quoted above in its written decision granting American Savings' Rule 41(b) motion, thereby establishing the court's awareness of the proper standard when ruling on a Rule 41(b) motion. The court for some reason then proceeded to consider whether the appellants had established a

prima facie case under § 3605. We are convinced that the trial court did not commit reversible error in doing so because the record, including the trial judge's opinion as well as his comments from the bench at the close of the plaintiffs-appellants' case, demonstrates that the court fulfilled its obligation "to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies." *Sanders*, 707 F.2d at 971.

The appellants also challenge several findings of fact relating to their claim under § 3605. The appellants allege, contrary to the court's findings, that American Savings 1) denied the Cartwrights' 1980 loan application; 2) discriminated against Mary Cartwright in requiring that she provide comparable housing information; and 3) engaged in credit discrimination, or "redlining," based on the racial character of the community in which the Cartwrights intended to build.

We review the district court's findings of fact under the "clearly erroneous" standard of Fed.R.Civ.P. 52(a), which imposes a heavy burden on the appellants. *Chicago Litho Plate Graining v. Allstate Can Co.*, 838 F.2d 927, 929–30 (7th Cir.1988). The question for this court under Rule 52(a) is whether based on the evidence presented we are left with a definite and firm conviction that the trial court erred in its judgment. *Id.* (quoting *Hughes v. United Van Lines*, 829 F.2d 1407, 1416 (7th Cir. 1987)). As the Supreme Court stated:

"If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are

---

**13.** The plaintiff-appellant Open Housing Center brought suit under the above-stated theory "on its own behalf and on behalf of its members," seeking injunctive relief and $5,000 in actual damages. The trial court, relying on *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), denied American Savings' motion for summary judgment alleging that the Open Housing Center lacked standing to bring suit. In *Coleman* the Supreme Court

considered whether an open housing center (HOME) had standing to bring suit on its own behalf under the Fair Housing Act. The Court held that HOME did have standing, based on allegations of direct injury similar to the injuries alleged in the appellants' complaint. *Id.* 455 U.S. at 378–79, 102 S.Ct. at 1124–25. On appeal, American Savings does not dispute the Open Housing Center's standing; therefore, we need not address the issue.

two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous."

*Chicago Litho Plate,* 838 F.2d at 930 (quoting *Anderson v. Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)).

Initially, we address the appellants' contention that the district court erred in finding that the Cartwrights' 1980 loan application was not denied by American Savings but rather "went into abeyance and into limbo" due to a "lack of communication, inconsistent positions taken by Mrs. Cartwright, and total misunderstanding...." We note (and the appellants concede in their brief) that the court's finding that American Savings never denied the 1980 application is consistent with Louis Green's testimony. Louis Green testified that American Savings never denied the Cartwrights' 1980 loan application. He said that the application was never presented to the American Savings' loan committee much less was it ever approved or rejected. According to Green, he took no action on the application because he was waiting for Mrs. Cartwright to supply the comparable housing information she offered to submit, and because Mrs. Cartwright told him in a telephone conversation in early 1981 that she was still interested in obtaining a loan but had some "personal problems" to work out.

The appellants contend that the trial judge erred in giving credence to Louis Green's testimony because it conflicted with Mary Cartwright's testimony. Mary Cartwright testified that she never agreed to provide American Savings with comparable housing information, requested the

American Savings personnel to put her 1980 loan application "on hold," nor did she advise Green of any change in plans due to her October 1980 separation and subsequent divorce from Lawrence Cartwright in February 1981. On the other hand, neither Mary nor Lawrence Cartwright testified that they ever received a notice of rejection concerning their 1980 loan application, and there is no documentary or other evidence that American Savings ever approved or rejected it.[14] The absence of such evidence supports Green's testimony that he never presented the application to American Savings' loan committee for rejection or approval. Therefore, the appellants' allegation that American Savings denied the Cartwrights' 1980 application is without a scintilla of proof in the record.

In addition, we decline to disturb the district court's finding that Mary Cartwright agreed to provide comparable housing information and told Green in early 1981 that she had "personal problems" and would get back to him. We disagree with the appellants' contention that these findings are clearly erroneous simply because they are at odds with the Cartwrights' self-serving testimony. "Where the district court's findings are based on its decision 'to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.'" *Bartsh v. Northwest Airlines, Inc.,* 831 F.2d 1297, 1306 (7th Cir.1987) (quoting *Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985)).

14. The appellants contend that Green's tape-recorded comment to Mary Cartwright on May 4, 1982, that the Cartwrights' 1980 loan application "died a natural death" supports their position that American Savings rejected the application. We disagree. When Mrs. Cartwright inquired about the status of the 1980 application during the May 4, 1982, telephone conversation, Green stated that the application "died a natural death" because Mrs. Cartwright failed to forward the comparable housing information as she had agreed to do. He also explained that the Cartwrights' circumstances (divorce) changed in the year and a half since the application had been filed (according to Green, their circumstances must have changed "in terms of income, financial responsibilities and everything else ...") and that the 1980 application was therefore outdated and unreliable. Green directed Mrs. Cartwright to file a new application. Thus, Green's comment that the 1980 loan application "died a natural death" reinforces the trial court's finding that the application was never rejected but "went into abeyance and into limbo" while American Savings waited for Mrs. Cartwright to work out her "personal problems" and forward the comparable housing information.

The timing and reality of the Cartwrights' divorce on February 3, 1981, certainly may be considered as corroborating Green's testimony that Mrs. Cartwright called him in early 1980 complaining of "personal problems," as this early 1980 phone conversation and Mrs. Cartwright's marital problems occurred during the same time frame. Based upon the record when read in its entirety, it was certainly logical for the trial judge to find that Mrs. Cartwright informed Green of her "personal problems" during this period and that Green believed she intended to have her application placed on hold while she determined, in light of her marital difficulties, whether she was still interested in building a larger, more expensive home (in fact, following the divorce Mrs. Cartwright decided to build a more modest home). Similarly, the record contains evidence that tends to corroborate Green's testimony that Mary Cartwright agreed to provide comparable housing information. While Mrs. Cartwright denied during trial that she agreed to provide this information, her deposition testimony, which was read into the trial record, raised a question regarding her credibility: When asked during her deposition if she told Green that she would obtain the information, she did not deny it, but suggested she agreed to do so, stating that she "probably said 'yes' or 'I'll try.'" Thus, the trial court could well have questioned Mrs. Cartwright's credibility on this issue, and give more credit to Green's testimony.

It is well settled that credibility determinations are the sole province of the trial court, to which this court owes special deference on appeal.

"When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bears so heavily on the listener's understanding of and belief in what is said."

*Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). Because the trial court had the opportunity to observe the variations in the witnesses' demeanor and tone of voice that bears so heavily on the credibility of the conflicting testimony regarding American Savings' treatment of the Cartwrights' 1980 loan application, and because Louis Green's testimony was neither contradicted by extrinsic evidence nor internally inconsistent, we hold that the trial court's findings based on Green's testimony certainly cannot be considered clearly erroneous.

■ The appellants also complain that the trial court failed to make an express finding regarding Green's credibility, or that of Mary and Lawrence Cartwright. In *Bechold v. IGW Systems, Inc.,* 817 F.2d 1282, 1285 (7th Cir.1987), the appellant challenged the lack of express findings of credibility. This court stated:

"Where it is clear that the district court made a credibility determination in arriving at its findings of fact, we have treated such findings as tantamount to credibility determinations. We will not require a specific incantation when the basis of a finding is otherwise clear."

It is clear, based upon the trial judge's comments from the bench after the presentation of the plaintiffs-appellants' evidence, that the judge was well aware of the conflicts in the testimony between Green and the Cartwrights, and that it was imperative that he make credibility determinations. The judge stated:

"You know, these are always difficult questions when they somewhat get into the close area, and particularly for the Court when we're acting at bench, without triers of fact sitting over here duly sworn to do their duty. But it seems to me that what we have here really goes down to two people, Mrs. Cartwright and Mr. Green.

This is the beginning, this is the nexus that connects everything else that goes from there. *And it's a question of credibility and of inferences and of nuances and shadings and variations and back and forth and hues of colors, just like on the [census tract] map."* (emphasis added)

We are not persuaded that *Kweskin v. Finklestein*, 223 F.2d 677 (7th Cir.1955), requires a specific finding of credibility, as the appellants allege. We reversed and remanded in *Kweskin* because the trial court failed to make adequate findings of fact, where "the only finding of fact made by the court in addition to the place of residence of each of the parties was that plaintiff failed to prove the material allegations of the complaint." 223 F.2d at 678. *Kweskin* is clearly distinguishable, as the trial judge herein made numerous findings of fact. We are convinced beyond a shred of doubt from our review of the record, including but not limited to the court's comments from the bench (specifically that the case involves "a question of credibility,") that the district court did in fact make adequate credibility determinations to our satisfaction.

The appellants in their litany of alleged errors also challenge the trial court's finding that American Savings did not require Mary Cartwright to supply comparable housing information in the East Hammond urban renewal area. They urge that the finding is contrary to Louis Green's testimony.

As previously set forth (*supra* pp. 914–915) Louis Green testified that Mary Cartwright called him in September 1980 inquiring about the status of the 1980 loan application. He further testified as follows:

"[A]fter explaining to [Mrs. Cartwright] that we were having a little difficulty in finding market comparables, [she] said to me, 'Well, I have several friends of mine that are in the process of building homes like or larger than this.'

And I asked her, 'Could you possibly get us some information to that effect, something that we'd have a handle on the market in that particular area?' And she said, 'I'll be happy to do that.' And I said, 'You can either get it to me or get it to Vern Lee, his office,' and I—I assume I told her where his office was."

Green stated that he was unable to submit the Cartwrights' 1980 loan application to American Savings' loan committee due to Mrs. Cartwright's failure to communicate the comparable housing information as she had offered to do. In addition, Green testified that it was "typically not" American Savings' "policy and procedure[ ] to base a decision on whether to grant a loan on appraisals obtained or information obtained by the customer on the value of properties. . . ."

Louis Green's query "Could you possibly get us some information to that effect?" (in response to Mary Cartwright's statement that she had friends in the process of building comparable homes in the urban renewal area) when logically interpreted falls far short of either being a demand much less being interpreted as a requirement that Mrs. Cartwright provide comparable housing information. Green's query was simply a question based upon her offer, suggesting that (if Mrs. Cartwright was so inclined) she could aid and speed up the loan application process with the forwarding of the relevant information at her disposal which had thus far eluded American Savings' appraiser. Furthermore, Cartwright's response to Green's query ("I'll be happy to do that," i.e., provide the information) contains no hint of compulsion.

It is true, according to Green, that it was "typically not" American Savings' policy to obtain vital appraisal information of this nature from loan applicants.[15] However, Mrs. Cartwright prompted and initiated Green's request for comparable housing information when she volunteered that she had "several friends . . . that are in the process of building homes like or larger than this," and she could have declined Green's invitation to supply information relating to those proposed constructions. Moreover, Mary Cartwright had a fifteen year business relationship with American Savings, commencing in 1965 when American Savings approved a mortgage loan on Mrs. Cartwright's Columbia Avenue residence, and Louis Green had previous con-

---

15. Indeed, it is common knowledge that banks and savings and loans certainly do not accept an individual borrowers' appraisals of their own property, but hire professional independent appraisers to perform that task.

tact with Mary Cartwright when she applied (and obtained approval) for a second mortgage on her Columbia Avenue home in 1977. This evidence, considered with all of the other evidence in the record, falls far short of demonstrating that American Savings discriminated against Mary Cartwright when Louis Green asked her if she could possibly provide comparable housing information after she challenged the independent appraiser's (Lee & Associates) lack of success in providing the necessary loan data.

■ The trial court also found that the documentary evidence fails to support the appellants' allegation that American Savings engaged in redlining in violation of § 3605 of the Fair Housing Act. The appellants argue in their plethora of unsupported claims of error that the statistical as well as the testimonial evidence supports their redlining allegation.

The plaintiffs-appellants' statistical evidence of redlining from our review seems to rest upon two trial exhibits they prepared from information American Savings supplied revealing that American Savings granted two residential mortgage loans from January 1980 through January 1984 in the substantially black, urban area of Hammond containing Mary Cartwright's Merrill Street property ("census tract" number 207).[16] In contrast, American Savings granted, during the same period, thirty six residential mortgage loans in census tract number 427, and twenty-five residential mortgage loans in census tract number 404, both of which, according to the 1980 census, have a zero to one percent black population. The appellants maintain that the disparity in the number of the residential loans American Savings granted in a minority area as opposed to a non-minority area constitutes proof of redlining.

The obvious flaw in the appellants' "disparity" argument is their failure to identify any relevant statistical evidence of the number of residential loan applications American Savings received from financially qualified borrowers in any particular census tract or geographical area, and how many of those applications it rejected.[17] Such proof lies at the very heart of any redlining allegation, as it is absurd to allege a discriminatory refusal to approve loan applications in a particular area without proof that qualified borrowers actually applied and were rejected. We are unmoved by the fact that American Savings granted "only" two loan applications between January 1980 and January 1984 in census tract 207, because the appellants failed to present evidence of the number of applications American Savings received in that time frame for property located in that tract. It may be (for all we can determine from the record before us) that American Savings received only two loan applications for housing purchases in census tract 207, and granted them both. This evidence of a violation of § 3605 falls far short of establishing redlining.

Moreover, Louis Green's testimony supports the conclusion that the number of

16. The exhibits the appellants rely upon list all of the loans American Savings granted from January 1980 through January 1984 and contain a breakdown of each loan disclosing the date, amount and terms of the loan, as well as the zip code and "census tract" (according to the 1980 census) containing the mortgaged property. Janet Dermody, the executive director of the Northwest Indiana Open Housing Center, testified that Mary Cartwright's Merrill Street property, the subject of the Cartwrights' 1980 loan application, is located in census tract 207. Ms. Dermody also testified that at the time of the 1980 census the population in census tract 207 was 25.1 to 50 percent black.

17. We note that the record does include what Louis Green identified as American Savings' "Loan Application Registry Summary" or "LARS Report," a document American Savings was required to prepare and file with the Federal Home Loan Bank Board. The LARS Report contains a breakdown of all the residential loan applications American Savings received from November 1, 1980 through 1985, the amount of the loan requested and whether the application was granted, denied or withdrawn. However, the LARS Report does not disclose the number of loan applications American Savings received for property located in particular census tracts or identifiable geographical areas. Moreover, the appellants do not rely on the LARS Report, as it is not mentioned in their brief and Janet Dermody testified that the appellants did not utilize it in preparing the exhibits they relied upon as proof of their redlining allegation.

residential loan applications granted in census tract 207 was low because applications were few and far between, and not because American Savings practiced credit discrimination. Green (who served on American Savings' loan committee) testified that to his knowledge American Savings did not reject a single residential loan application from 1978 through the time of trial relating to property located in census tract 207. In addition, Green testified that American Savings did not receive any loan applications for construction in the East Hammond urban renewal area (part of census tract 207) prior to the time the Cartwrights applied for their loan in August 1980, and that the number of mortgage loan applications was generally low in 1979 and 1980 probably or possibly due to extremely high interest rates. We fail to understand how American Savings can be considered as responsible for redlining a particular geographical area if in fact as the testimony reveals it granted every application submitted to it for homes located therein, and the appellants failed to demonstrate that that is not, in fact, what occurred.

At oral argument, the appellants' counsel conceded that there is no "raw data" in the record establishing the number of residential loan applications American Savings received and rejected in "census tract" number 207. However, counsel contended and speculated that—based on Louis Green's treatment of Mary Cartwright during their May 28, 1982, meeting—that American Savings has a policy of "discouraging" loan applications for property located in minority neighborhoods. As we discuss *infra* pp. 926–927, Louis Green did not "discourage" Mary Cartwright from filing a new loan application in May 1982. Rather, Green provided information regarding the record high 17½ percent interest rate and the availability of low interest loans through another institution participating in the Indiana Housing Authority's bond program. We find no evidence in the record that would tend to suggest much less establish that Green offered the information with a racially discriminatory motive. We therefore reject the appellants' contention that American Savings had a policy of discouraging mortgage loan applications for property located in substantially or predominantly black neighborhoods.

The appellants also contend that their claim of redlining finds support in Mary and Lawrence Cartwrights' testimony that Louis Green told them during the initial August 28, 1980, meeting that the East Hammond urban renewal area could not "support" or "afford" a house as large as the one the Cartwrights wanted to build, but that other communities could support it. We note that the district court's findings of fact are silent as to whether Louis Green actually told the Cartwrights that the urban renewal area could not "afford" their proposed home, and this court refuses to assume facts unsupported as findings in the district court record. Even assuming that Green told the Cartwrights that the urban renewal area could not "afford" their proposed residence, we are not persuaded that the evidence establishes redlining.

■ The Fair Housing Act's prohibition against denying a loan based upon the location of the dwelling does not require that a lender disregard its legitimate business interests or make an investment that is not economically sound. It seems obvious that a lender must be concerned, for example, about financing a new, $90,000 home in a residential area comprised of homes valued at $60,000 or less. If the borrower defaults on the loan, the lender must foreclose and may be unable to recoup its investment, as potential buyers might be reluctant to pay $90,000 for the home (and other lenders may be unwilling to finance the purchase) in light of the surrounding property values. The regulations implementing the Fair Housing Act address this type of concern, stating lenders may legitimately consider "the present market value of the property offered as security ... and the likelihood that the property will retain an adequate value over the term of the loan." 12 C.F.R. § 31.8(c)(7). *See also Thomas v. First Fed. Sav. Bank of Indiana,* 653 F.Supp. 1330, 1340 (N.D.Ind. 1987) ("there is nothing in the Board's regulations or in the Board's policies which

mandates an association to make a bad loan as long as the criteria they use for making the loan are legitimate business criteria...." *Id.* (quoting *Laufman v. Oakley Bldg. & Loan Co.*, 408 F.Supp. 489, 501 (S.D.Oh.1976))).

■ If Louis Green told the Cartwrights that the East Hammond urban renewal area could not "afford" their proposed home, we believe the comment reflected American Savings' legitimate financial concern regarding (in the language of the regulation) "the present market value of the [Cartwrights'] property" and "the likelihood that the property [would] retain an adequate value over the term of the loan." In fact, Louis Green testified that his principal concern was that the Cartwrights' property and proposed residence would not retain an adequate value over the term of the loan, thereby putting American Savings at risk:

"Q: Mr. Green, when the Cartwrights came to see you in August of 1980, were you generally familiar with the urban renewal section in which they were proposing to build the house?

A: Generally familiar.

Q: What, if any, concern did you have about their plans to construct a $95,000 or $100,000 home in that area?

A: I assume that my concern was that there may not be—it might be an over-improvement for the area.

Q: What do you mean by an over-improvement to the area?

A: Well, an area, let's say comprised of $60,000 homes would have a—assuming you're going to build a $100,000 home in that particular area, as a lender we would obviously have a problem should we get that particular property back in a year or two or three or five.

* * * * * *

Q: Now, when you either met with the Cartwrights or talked to Mrs. Cartwright concerning information about other construction or pending construction or plans, why did you ask the Cartwrights to give you that information?

* * * * * *

A: Because to my way of thinking, that would be—it could very well be without any comparable homes, it would effectively be a depreciating influence, thereby endanger—increasing our risk as lender."

Neither Mary nor Lawrence Cartwright, nor Green's testimony, permits an inference that American Savings refused to invest in the East Hammond urban renewal area. The evidence demonstrates nothing more than that American Savings was concerned about financing a large, relatively expensive home in an area lacking other homes of comparable market value and sound economic judgment of this nature cannot be considered as a violation of the Fair Housing Act. As the lending institution, American Savings certainly has a real and substantial, legitimate interest in recouping its investment in the event the Cartwrights defaulted on their loan. Moreover, there is nothing in the record which leads us to believe that American Savings would have been concerned about the location of the Cartwrights' property had they intended to build a home of comparable value to others in the area. We affirm the district court's conclusion that American Savings did not engage in redlining in violation of § 3605 of the Fair Housing Act.

*§ 3604 of the Fair Housing Act.*

■ The appellants contend that the trial court erred in concluding as a matter of law that their allegations against American Savings are not actionable under 42 U.S.C. § 3604 (cited *supra* n. 10), for the reason that § 3604 applies to a discriminatory refusal to "sell" or "rent" a dwelling, rather than a discriminatory refusal to "finance" a dwelling, as the appellants alleged in this case. We need not decide whether the district court's action was proper in concluding as a matter of law that the plaintiffs-appellants' allegations are not actionable under § 3604 because, regardless of our decision on the issue, we must affirm the court's Rule 41(b) dismissal of the § 3604 claim on the merits.

Section 3604 requires proof of discrimination "because of race, color, religion, sex, or national origin." The trial court heard all of the plaintiffs-appellants' evidence relating to all of the causes of action raised in their complaint, including their § 3604 claim, before granting the defendant-appellee's Rule 41(b) motion. The court rendered findings of fact which specifically state that "American Savings' treatment of Mary and Lawrence Cartwrights' 1980 loan application was not based upon the race of Mary and/or Lawrence Cartwright and the racial character of the community in which they intended to build. American Savings' treatment of Mary Cartwright's loan inquiries in 1982 was not based upon Cartwright's race and/or sex or the racial character of the community in which she intended to build." The court also found no evidence of reclining, which is actionable under § 3604. *Southend Neighborhood Improvement Ass'n v. County of St. Clair*, 743 F.2d 1207, 1209 (7th Cir.1984). Because the district court found that American Savings did not discriminate against Mary Cartwright based on her race or sex and did not engage in redlining, and these findings preclude recovery under § 3604 (even assuming, without deciding, that the appellants' allegations fall within that section), we hold that the district court properly granted the appellee's Rule 41(b) motion on this claim as well.

The appellants further allege that the trial court erred in concluding that the appellants' Fair Housing Act claims are barred by the 180–day statute of limitations contained in § 3612 of the Act. We need not review the district court's ruling on this issue because we affirm the court's Rule 41(b) dismissal of the appellants' Fair Housing Act claims on the merits, based on the court's findings of fact that American Savings did not engage in racial or sexual discrimination.

*The Equal Credit Opportunity Act Claims*

■ The appellants also challenge the district court's rejection of their claims under the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, the relevant portion of which provides:

**"Activities constituting discrimination**

(a) It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction—

(1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract);

\*    \*    \*    \*    \*    \*

**Reason for adverse action; procedure applicable; definition**

(d)(1) Within thirty days (or such longer reasonable time as specified in regulations of the Board for any class of credit transaction) after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application.

(2) Each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor. A creditor satisfies this obligation by—

(A) providing statements of reasons in writing as a matter of course to applicants against whom adverse action is taken; or

(B) giving written notification of adverse action which discloses (i) the applicant's right to a statement of reasons within thirty days after receipt by the creditor of a request made within sixty days after such notification, and (ii) the identity of the person or office from which such statement may be obtained. Such statement may be given orally if the written notification advises the applicant of his right to have the statement of reasons confirmed in writing on written request."

15 U.S.C. § 1691.

Initially, the appellants contend that American Savings violated § 1691(a)(1) above with respect to the Cartwrights' 1980 loan application in requiring that Mary Cartwright provide comparable housing information while refraining from im-

posing such a requirement on other borrowers. Because we have previously determined that the trial judge was not clearly erroneous in ruling that Mary Cartwright volunteered, and was not required, to supply the comparable housing information, we reject the appellants' challenge to the trial court's ruling dismissing their claim under 15 U.S.C. § 1691(a)(1).

The appellants further allege that American Savings violated § 1691(d)(1) above in failing to notify the Cartwrights that it either approved or rejected the Cartwrights' 1980 loan application. Mary Cartwright's representations to Louis Green regarding her willingness to provide comparable housing information and her "personal problems" effectively and properly in accepted business practice and procedure would have mandated placing her application on hold, thus in effect precluding American Savings from taking "action" one way or the other under § 1691(d)(1). We are convinced that the trial court properly dismissed the appellants' § 1691(d)(1) claim. As to the appellants' claim under § 1691(d)(2), they allege that American Savings failed to notify Mary Cartwright of the adverse action taken on the Cartwrights' 1980 loan application, and failed to provide a statement of reasons therefore. As we concluded above, the trial court was not clearly erroneous in ruling that American Savings never even acted upon the Cartwrights' 1980 loan application, and thus never rejected it. Because § 1691(d)(2) requires that loan applicants receive a "statement of reasons" only where the lender takes "adverse action," and American Savings did not take "adverse action" on the Cartwrights' 1980 application, we hold that American Savings did not violate § 1691(d)(2).

Finally, the appellants argue that Louis Green's statements to Mary Cartwright during their May 28, 1982, meeting establish a violation of § 1691(a)(1) of the Equal Credit Opportunity Act. Green told Mrs. Cartwright during the May 28, 1982, meeting that interest rates were at an all time record high level of 17½ percent industry-wide; that it was financially advisable for her to sell her Columbia Avenue residence and use the proceeds as a downpayment on the loan needed for construction on her Merrill Street property; furthermore, that low interest loans were available to certain qualified borrowers through the Indiana Housing Authority's bond program and that another financial institution, Lake Mortgage Company, was a participant in the bond program.[18] The appellants, grasping for straws, and again venturing into the hazardous valley of speculation, claim that Green's advice was designed to discourage Mary Cartwright from applying for a home loan because of her race and her sex, and because American Savings did not want to invest in the East Hammond urban renewal area.

Our review of the record convinces us that Green did not discourage much less prevent Mary Cartwright from filing a loan application in May 1982. In our view, Louis Green offered Mrs. Cartwright valuable, sound financially reasoned, well-intentioned advice, for which she should have been appreciative, in advising her that the 17½ percent interest rates were at an all time high, that there were advantages in selling her Columbia Avenue home and that low interest financing was available through another institution. Lenders should be commended, rather than sued, for advising borrowers of their various options and the economic realities of the day. We fail to understand how Mrs. Cartwright could have interpreted Green's comments during the May 28 meeting to mean that American Savings did not want to do business with her. From our review, the record evidence demonstrates that American Savings was only too happy to accom-

---

**18.** Mary Cartwright testified that Louis Green also told her during the May 28, 1982, meeting that she should sell her Columbia Avenue home because "being a woman you can't take care of two properties." However, the district court did not make a finding of fact that Green made the comment to Mrs. Cartwright and thus implicitly rejected the testimony. Moreover, even assuming Green made the remark, we are convinced, viewing the record in its entirety, that the district court did not commit error in finding that American Savings did not discriminate against Mary Cartwright because of her sex.

modate Mrs. Cartwright, as well as to assist her in her desire to live in the East Hammond urban renewal area. American Savings and Mary Cartwright had been doing business together since 1965, and American Savings had approved a first and second mortgage on Cartwright's Columbia Avenue property, which the district court found (and the appellants do not dispute) is located in the same "census tract" as the Merrill Street property at issue in this case. If for seventeen years American Savings saw no reason to discriminate against Mary Cartwright because of her race, sex or the location of her property, it is specious to allege that it would discriminate against her in 1982. Indeed, when Mary Cartwright finally did fill out a new loan application with American Savings in October 1982 for her Merrill Street home, American Savings granted the application the following month. Therefore, we also affirm the district court's conclusion that American Savings did not violate § 1691(a)(1) of the Equal Credit Opportunity Act in connection with Mary Cartwright's 1982 loan inquiry.

We also feel compelled at this juncture to express our belief that this case is yet another product of our overly litigious society, where lawsuits result from every real or imagined slight. The evidence demonstrates that American Savings had a long, mutually satisfactory relationship with the appellant; that American Savings had on previous occasions granted first and second mortgages on the appellant's property located in the very same area she alleges American Savings redlined; that American Savings never denied the 1980 loan application that lies at the heart of the appellant's case; that the appellant effectively advised American Savings not to take any action on that application until she worked out her "personal problems"; and that in 1982 when the appellant was ready to pursue the loan, American Savings granted her new application—but the appellant decided to take her business elsewhere. These facts simply do not warrant the expense and diversion of private, public and judicial resources this suit has occasioned.

### Other Claims

The trial court also rejected the appellants' claims under 42 U.S.C. §§ 1981 and 1982, both of which require proof of racial discrimination (*see General Bldg. Contractors Ass'n, Inc. v. Pennsylvania,* 458 U.S. 375, 387–88, 102 S.Ct. 3141, 3148–49, 73 L.Ed.2d 835 (1982)), based on the court's finding that the appellants failed to demonstrate that American Savings discriminated against Mary Cartwright because of her race. We have already determined that that finding is not clearly erroneous. Therefore, we affirm the district court's dismissal of the appellants' claims under §§ 1981 and 1982.

Lastly, the trial court concluded that the Northwest Indiana Open Housing Center was not entitled to relief on its theory that American Savings hindered its mission of eliminating housing discrimination in Northwest Indiana. In light of our affirmance of the district court's conclusion that American Savings did not discriminate against Mary Cartwright because of her race or sex or the neighborhood in which she intended to construct her home, we also conclude that American Savings' conduct could not possibly have hindered the Northwest Indiana Open Housing Center's mission of eliminating housing discrimination in Northwest Indiana.

### III.

We hold that the trial court's findings of fact, based on its consideration of the documentary evidence and the credibility of the witnesses, are not clearly erroneous. We also concur with the court's conclusions of law. The costs of appeal shall be taxed against the plaintiffs-appellants. The defendant-appellee shall submit an itemized and verified bill of costs to the Clerk of Court, with proof of service within fourteen days after entry of judgment (*see* Fed. R.App.P. 39(a) and (d)). The judgment of the district court is AFFIRMED.

CUDAHY, Circuit Judge, concurring:

I concur in the result and in the analysis because the issues primarily involve questions of fact and the district court's fact-

finding is not clearly erroneous. I should prefer, however, not to address the general question who is the more deserving or meritorious litigant. This is a question we have neither the capability nor the obligation to answer.